(19 Misc. Rep. 274.)

### McCARTHY v. ST. PAUL FIRE & MARINE INS. CO.

(Supreme Court, Trial Term, New York County. January, 1897.)

MARINE INSURANCE—CONDITIONS OF POLICY—OVERLOADING VESSEL.

   No recovery can be had on a policy exempting the insurer from liability for any loss caused by overloading, where the insured vessel was licensed to carry 45 passengers, and sank while carrying 81, unless it is shown that such overloading did not cause or contribute to the disaster.

Action by John McCarthy against the St. Paul Fire & Marine Insurance Company on a policy of marine insurance. Judgment for defendant.

Deady & Goodrich, for plaintiff.

Cowen, Wing, Putnam & Burlingham (Esek Cowen, of counsel), for defendant.

McADAM, J. The action is by the owner of the steamtug James D. Nicol, to recover $5,000 for a loss caused by the foundering of the tug just outside of New York Harbor, on June 24, 1894. The defense is founded on a condition of the policy declaring that the defendant would not be liable for any loss consequent upon and arising from overloading or any violation of the navigation laws and regulations of the United States. The statute provides that the inspectors of a port shall license vessels, and declare the number of passengers which can be carried with safety and prudence, and that it shall be unlawful for any vessel to go upon any voyage with a greater number of passengers than such vessel is licensed to carry. Rev. St. U. S. §§ 4464, 4465. The rule of navigation so declared is a salutary one, intended to protect life and property. The decision of the inspectors is made conclusive upon the subject (see Kennedy v. Gibson, 8 Wall., at page 505; Casey v. Galli, 94 U. S. 673); and,

on their declaration, the owners of the vessel are to provide the life preservers, life boats, and other appliances necessary to enable the designated number allowed on board reasonable means of escape in case of danger. Moreover, common experience demonstrates that a crowded passenger boat is more difficult to control in an emergency than one lightly burdened, and the tendency to sink increased. Cargo may be thrown overboard when necessary to lighten a vessel. It is not so with human life.

The inspectors had licensed the tug to carry not exceeding 45 passengers, and upon the voyage in question she carried 81 besides the crew. This, it is claimed, was overcrowding, and made the vessel for the time being unseaworthy, causing her to capsize and sink, as a result of which 42 of the party lost their lives. The sinking was variously described; but the witnesses generally agree that a storm came on, and, as it approached, the boat lunged with the sea, which struck it on the starboard side, throwing the spray all over the decks, and driving the passengers to the port side; whereupon the boat listed in that direction, and the returning wave turned it over. The plaintiff's witness Capt. Hyde, who was in command, substantially admitted testifying at an investigation following the disaster that the foundering occurred in this manner:

"The people all got on the port side, and shipping the sea caused it [the boat] to list on the port side, and the added weight of the water that she shipped caused her to lay over so far that the water ran over her rail, and so on, into her doors."

The fact that the captain was not properly licensed is of no consequence, under the ruling in Tebo v. Jordan, 147 N. Y. 387, 42 N. E. 191.

The tug was only 75 feet long, and 17 feet beam, and on the fatal day was unquestionably overloaded, in violation of the navigation laws of the United States. If this overloading either caused or contributed to the foundering, the loss was a risk expressly exempted from the security of the policy. It is not necessary to decide that the provision as to observing the laws of navigation was a warranty, in the sense that the policy was avoided by the mere fact of overcrowding; and it will be assumed that, to vitiate the policy, the accident must have been one "consequent upon or arising from" the overloading or violation of the law referred to.

When the plaintiff proved the loss from a peril of the sea, he was prima facie entitled to recover. But when the defendant established that the tug was overloaded, in violation of the statute, the burden was thrown upon the plaintiff to show that the overloading could not have caused or contributed to the accident, but that the foundering resulted from some peril insured against; and no such evidence was produced by the plaintiff. It will not do to attribute the sinking solely to the storm, for the boat was staunch and well calculated to ride through it in safety. It was built with that end in view. The storm was not an unprecedented or unusual one, and all the other tugs that went out that day came back in safety, several of them following in the wake of the Nicol.

In The Pennsylvania, 19 Wall. 125, 136, the court said:

"Concluding, then, as we must, that the bark was in fault, it still remains to inquire whether the fault contributed to the collision, whether in any degree it was a cause of the vessels coming into a dangerous position. It must be conceded that, if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration. * * * But when, as in this case, a ship, at the time of a collision, is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was, at least, a contributory cause of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been."

The rule as clearly applies to an insurance case as to one of collision.

Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 10 Sup. Ct. 934, was an action to recover upon an insurance policy, and one of the defenses was that the vessel, at the time of the accident, was sailing in violation of the navigation laws of Canada. The court said:

"In The Pennsylvania, 19 Wall. 125, it was held that, where a vessel has committed a positive breach of statute, she must show, not only that probably her fault did not contribute to the disaster, but that it could not have done so; and this was but the statement of the settled rule in collision cases. In this case, in view of the seventh section of the Canadian statute, and the fact that perils occasioned by the want of ordinary care and skill or of seaworthiness were excepted by the policy, the same rule is applicable; hence the burden was on the plaintiff to show that neither the speed of the steamer nor the defect of the compass could have caused, or contributed to cause, the stranding. * * * It was necessary to the plaintiff's case that it should appear from the whole proof that the loss was not occasioned by the want of ordinary care by the master, or on account of unseaworthiness, and was not within exceptions contained in the policy, against which plaintiff was not insured."

The contract of insurance against the perils of the seas is one that was suggested by and sprang from the hazards peculiar to ships and vessels in the pursuit of maritime commerce. In like manner, the rights, duties, and liabilities which are its characteristics have always been regulated by the maritime law. Indeed, the investigation of a case of marine insurance is but an inquiry into the facts, transactions, and perils of navigation and rules of the maritime law. Ben. Adm. (2d Ed.) § 294. It may, in general, be said that everything which happens to a vessel in the course of her voyage by the immediate act of God, without the intervention of human agency, is a peril of the sea. 1 Park, Ins. 136. But the act of those in charge of the tug in allowing 81 persons besides the crew to go to sea in a small craft, licensed to carry 45, was dangerous and reprehensible in the extreme. They were bound to assume that storms, which are common occurrences, might come on before the completion of the voyage, and that disaster might befall the fishing party in their charge if the regulations of the government, founded on the judgment of experience, were ruthlessly violated. Although the courts give effect to this species of contract by a liberal and equitable construction, yet they must be cautious not to extend the principle that the acts of the parties may extend beyond their intention; and therefore they will attend to the words

of the contract, and see that the loss which is proved to have happened is really one of those risks against which the underwriter has insured.    Park, Ins., 138.

Where there are two or more possible causes of an injury, for one or more of which the defendant is not responsible, the plaintiff, in order to recover, must show by evidence that the injury was wholly or partly the result of that cause which would render the defendant liable.    If the evidence in the case leaves it just as probable that the injury was the result of one cause as of the other, the plaintiff cannot recover.    Grant v. Railroad Co., 133 N. Y., at page 659, 31 N. E. 220; Searles v. Railroad Co., 101 N. Y. 661, 5 N. E. 66; Taylor v. City of Yonkers, 105 N. Y. 202, 209, 11 N. E. 642.    The tug started on its errand a violator of the law, and took the chances of all that followed.    The venture was a bold one, and turned out disastrously. Those in charge voluntarily assumed risks expressly excepted from those covered by the contract, and they cannot complain if they suffer from their own misconduct.    Laws passed in the interest of public safety, and contracts made with reference to them, must be observed, or the violators may come to grief.    The disregard of government regulations was clearly the predominating and efficient cause of the loss herein.

There was an effort made to show that the owners did not know that upon the voyage in question the tug carried a larger number of passengers than it was licensed to take aboard.    The policy declared that an accident wholly or partially caused by overloading or by a breach of the navigation laws is not one of the perils insured against, and the plaintiff cannot recover, no matter how the overloading or the breach was occasioned; and, whether he actually knew or did not know it, the legal result is the same.    The master was legally in charge with the consent of the owners, and his acts are their acts so far as this question is concerned.    Story, Ag. §§ 116, 316; Ben. Adm. (2d Ed.) § 290; Carroll v. Railroad Co., 58 N. Y., at page 142.    The act of the master, though culpable, does not excuse the owner, for even barratry is one of the grounds of exemption mentioned in the policy.

These views lead to a judgment for the defendant.