THE PENNSYLVANIA.

1. A collision occurred in a very dense fog between a sailing bark and a large steamer, about two hundred miles from Sandy Hook, and therefore in the track of inward and outward bound vessels.   The bark was under way moving slowly, and at about the rate of a mile an hour, and was *ringing a bell* as a fog signal.   The steamer was going at the rate of seven knots an hour.

*Held,* That the damages were to be equally divided between the two vessels, as, being both in fault, the steamer in moving in such a place at so rapid a rate in so dense a fog, the bark for her violation of the act of Congress for preventing collisions at sea (identical in this respect with the British Merchants' Shipping Act), which requires, in its "Rules concerning Fog Signals," that "sailing vessels under way shall use a *foghorn*," and "when not under way shall use a *bell*."

2. Although, if it clearly appears that a fault committed by a vessel has had nothing to do with a disaster which has occurred, the liability for damages is against the vessel alone which has produced the disaster, still where a vessel has committed a positive breach of statute she must show not only that probably her fault did not contribute to the disaster, but that certainly it did not; that it could not have done so. In this case, therefore, Congress having made the use of a foghorn obligatory on sailing vessels under way in a fog, it was declared to be out of place to go into an inquiry whether, in fact, a bell gave notice to the steamer that the bark was where she was as soon as a foghorn would have done.

APPEAL from the Circuit Court for the Southern District of New York; the case being thus:

An act of Congress for preventing collisions at sea*—the act being essentially the same as one† enacted by the British Parliament—lays down these

### *Rules governing Fog Signals.*

Whenever there is a fog, whether by day or night, the fog signals described below shall be carried and used:

Steamships under way shall use a steam whistle.

*Sailing ships under way shall use a foghorn.*

Steamships and sailing ships when not under way shall use a bell.

This statute being in force, the Mary Troop, a British bark, was bound from Androssan, in Scotland, to New York, with a cargo of iron, and at ten o'clock on a morning of June, 1869, found herself still on the high seas, about two hundred miles from Sandy Hook. A dense fog was prevailing at the time, so thick that a large vessel could hardly be seen at the distance of fifty feet. The wind was variable, and rather strong from south to southwest. The bark was under

---

* Act of April 29, 1864, 13 Stat. at Large, 61 ; Article **10**.

† The Merchants' Shipping Act of 1862.

way, heading from southeast to south-southeast, and moving at least a mile an hour; her helm lashed three-quarters to port, but on her starboard tack, carrying two close-reefed topsails, foresail, foretopmast and mizzenstay sails; no sail aback. She had a bell, hung to the forestay by a reef-earing to the forestay, and this bell was rung by a lanyard tied to the tongue of the bell, from fifteen to twenty times a minute. She also had a good foghorn. This horn had been used the day before, but was not used on the morning of which we are speaking.

The whistle of a steamer was heard through the fog off the port side. The second mate, who had just at that moment reached the deck, called to the captain and mate, "Do you hear that foghorn?" The mate replied, "It is a whistle," and he and the captain at once ran aft. As they got on the quarter deck, the bows of a large steamer appeared through the fog heading rapidly for the bark, and but a short distance off. The steamer appeared to be then swinging on a starboard helm, but almost instantly changed her course on a port helm and struck the bark stem on, on the port side of the bark by the forerigging. The blow cut the bark in two and she sank instantly. The captain, the second mate, and four of the crew were drowned. The only persons saved were the mate, the cook, and two men who were in the watch below.

The steamer proved to be the British steam propeller Pennsylvania, a vessel of 300 horse-power, 2388 tons, and 341 feet long. Her speed at the time when she thus appeared to the bark and coming down upon her, was seven knots an hour.

There was nothing in the evidence beyond the evidence of her speed—if that was proof of want of precaution—to show any want of efficiency, vigilance, or precaution in the navigation and management of the steamer up to the first intimation of the bark's proximity. She had two lookouts at their stations, "keeping their eyes and ears open for anything that might come in the way." They heard the bell of the bark, and reported, "Ship ahead, a little on the star-

board bow." Order was given to the engineer, "Full speed astern," and the order was executed as soon as practicable. The helm was ported; then a call to " starboard " was heard from some quarter, and she starboarded; then again ported, but in less than half a minute after the report of "ship ahead" was made, and before the steamer had run her own length, she went head on into the bark with the deplorable result already stated.

When the steamer had got in the port of New York, the owners of the bark libelled her in the District Court there.

There was comparatively little dispute about facts. It was admitted that the steamer's rate was seven knots an hour. Her master was examined, and said:

"The steamer was going seven knots. Her highest rate of speed under the most favorable circumstances, is thirteen and a half knots. The wind, the day of the collision, was south-southwest, strong. The wind had been this way all the morning, and I think all the night. There was a good heavy swell— more than there should have been for the wind there was.

" Question. With the wind and sea as it was, could you have run your vessel safely at a less rate of speed?

"Answer. I don't consider we could have steered the vessel, going slower; that is, could not have steered her straight."

Two other masters were examined, and confirmed this view; but they had never, either of them, sailed the Pennsylvania, and each of them had sailed other vessels at a less rate.

On the other hand, one Lovett, a shipmaster for sixteen years, who had happened in 1865—she being then heavily laden—to be a passenger on the Pennsylvania, testified that on one whole day then, her speed, he thought, did not average over four knots an hour, and that he noticed no difficulty in her steerageway.

So, too, while the technical violation of law in ringing a bell instead of blowing a foghorn was not denied, evidence was introduced by the owners of the bark to show that a good bell could be heard further than a foghorn; evidence, however, which was contradicted by witnesses in behalf of

the steamer, who swore that if the foghorn was a good one it could be heard further off than could a bell.

The District Court condemned the steamer for the whole loss. On appeal by her to the Circuit Court, that court affirmed the decree, yielding assent, however, with great hesitation, to the view of the District Court, that notwithstanding the conceded violation on the part of the bark, of a plain rule of navigation, the consequences of the disaster were to be visited *entirely* upon the steamer. From the decree of the Circuit Court thus affirming the decree of the District Court, the present appeal was taken.

Before the case came here, and on the steamer's return to England, the owners of the cargo of the bark libelled her in the British admiralty. The case was heard there on evidence much less full than that upon which it was heard in New York, especially less full on the part of the steamer. The admiralty, admitting the violation of law by the bark in not sounding a foghorn, condemned, nevertheless, the steamer for the whole loss; considering that it was attributable to the improper rate of speed of the steamer in a fog so thick as here existed, and this decree was affirmed by the judicial committee of the Privy Council.*

*Messrs. William Allen Butler and John Chetwood, for the appellants:*

1. The presence of the bark was discovered by the steamer's lookouts at the earliest possible moment, and the steamer was, therefore, without fault in respect to that point. And the steamer was equally without fault in respect to every act done after the presence of the bark in her neighborhood was first indicated.

2. The bark was clearly in fault in not complying with the rule which required the use of a foghorn while she was under way. The rule is imperative:

"Sailing ships, when under way, *shall* use a foghorn."

3. The steamer was not to blame on account of her rate

* The Pennsylvania, 23 Law Times, 55.

of speed at the time of the collision.   Lovett's evidence as to the speed five years before the collision, when she was very heavily loaded, is irrelative to the present case.

The law prescribes no rate of speed, and in the absence of controlling evidence that seven knots is an unsafe rate of speed for a steamer under the circumstances shown in this case, the court cannot say that it is evidence of negligence when all the testimony shows that in every other respect the utmost care and vigilance were exercised to navigate the steamer safely.   The weight of evidence shows that it was the lowest rate of speed at which *this* steamer could go in the then state of the wind, consistently with safety.   A steamer has a right to go as fast as she can, provided that it is not so fast as to prevent her from avoiding vessels under way or at anchor which are complying with the law.   Had the bark been properly blowing a horn, or even regularly and loudly ringing a bell, it could have been heard, with the wind blowing as it was from the boat toward the steamer, at such a distance that the steamer might, and the court is bound to assume in this case would, have avoided the bark. Any other rule would impose upon ocean steamers the alternative of reducing their rate of speed, so as to render them much less serviceable by prolonging their voyage, or of taking the risk of being punished for every collision with a sailing vessel, however carelessly or illegally navigated. It would virtually announce to sailing vessels that in every case of collision with a steamer, the court would punish the steamer, even though innocent, and indemnify the sailing vessel, even though guilty.

4. The court below erred in attempting to speculate upon the question whether the established negligence and violation of law, on the part of the bark, was or was not the cause of the disaster.   The fact of such violation without excuse being proved, and the extent to which it operated as a proximate cause of the collision not being ascertained, it was error to impose the burden of the disaster upon a vessel which was complying with the law in all respects.

The decree below should be wholly reversed.

*Mr. R. D. Benedict, contra:*

The decree below is right.

The Pennsylvania was in fault in the contradictory orders which were given as to her helm. It was first ported, then starboarded, and then again ported. This shows that there was confusion on the part of the steamer. Such confusion is a fault. There was abundance of time for the steamer to have avoided the bark after her presence was known, by either starboarding or porting, if the steamer had been properly managed.

The fact that the bark was ringing a bell instead of blowing a foghorn, if a fault at all under the circumstances, was only a technical, not a substantial fault, and did not in any way contribute to the collision.

The bark was lying-to under close-reefed sails, with her helm lashed three-quarters to port. She was making leeway, heading from southeast to south-southeast, but going east by south, and making a speed of one mile per hour on that course, practically drifting helpless; as the opinion of the British Privy Council says, "forging ahead very softly."* Although the foghorn was the signal which the law requires for a vessel under way, yet the bell gave the louder signal, and could be heard farther. The fact that this master and mate, having a good foghorn on board, hung this bell on the stay to use as a fog signal, is conclusive. Their property and their lives were at stake, and it would require very strong evidence to induce any court to believe that they deliberately chose that one of the two signals, which carried with it the *smaller measure of protection.*

If it is to be held that this bark was "under way," still she was barely under way. And the case then is one in which the vessel being barely under way, used the signal for a vessel not under way, which was in fact a louder signal than the law required, and gave the notice required by the rule, viz., that the vessel was helpless, as was the fact. If that was a fault it was as already said not a substantial fault.

---

* The Pennsylvania, 23 Law Times, 57.

To visit it upon these owners with the loss of their vessel, would be a hard measure. If it was clearly made to appear that the steamer had been misled by it, the case would be a very different one. But the steamer was not misled in the slightest. It is not even suggested by opposing counsel that she was. And it is clear that she could not have been, because she don't pretend to have heard the bell at all; but acted confessedly on the call, "Ship ahead." If a horn had been blown, therefore, instead of a bell being rung, the movements of the steamer would have been the same. The collision then was absolutely unaffected by the substitution of the bell for the horn.

It is urged that the courts below should not have considered the question whether or not the ringing of the bell contributed to the collision. Doubtless it would simplify the trial of collision cases, if the courts were only called upon to inquire whether each vessel had complied with all the requirements of the law, and not to inquire whether any failure to comply with them had anything to do with the collision. But that would be an unheard of mode of disposing of these cases. The question always is: "Did the vessel commit a fault *which contributed to the collision?*" As Judge Phillimore puts it in this very case, "not which vessel was to blame, but which was to blame *for this collision,*" is to be considered. And a fault which did not contribute to it, has never been held a reason for refusing to a libellant his full damages.

In *The Farragut,*\* the absence of a special lookout was charged as a fault, and this court said:

"It is perfectly evident that the absence of a special lookout had nothing to do with the happening of the accident, and therefore it can have nothing to do with fixing the liability of the parties."

In addition to concurring decrees in the District and Circuit Court, which when they exist this court will not lightly disturb, we have on our side the high authority of the judi-

---

\* 10 Wallace, 334, 339.

cial committee of the British Privy Council, affirming the decree of the British admiralty. This court will not readily disturb the concurring decrees of so many tribunals.

Mr. Justice STRONG delivered the opinion of the court.

It may be that when the bark was discovered by those on board the steamer it was too late to avoid a collision. The two vessels were then not more than three or four hundred feet apart, and the steamer had the bark almost across her bow. Yet it is possible that if her helm had been put to starboard instead of to port when the lookout announced, "Bell on the starboard bow," and had been kept starboarded, the collision might either have been avoided or have been much less disastrous. By porting her helm she was turned toward the point where the bell indicated the bark was, and this apparently increased the danger of a collision.

But if this is not to be attributed to her as a fault, there is no excuse to be found in the evidence for the high rate of speed at which she was sailing during so dense a fog as prevailed when the vessels came together. The concurrent testimony of witnesses is that objects could not be seen at any considerable distance, probably not farther than the length of the steamer, and yet she was sailing at the rate of at least seven knots an hour, thus precipitating herself into a position where avoidance of a collision with the bark was difficult, if not impossible, and would have been, even if the bark had been stationary. And she ought to have apprehended danger of meeting or overtaking vessels in her path. She was only two hundred miles from Sandy Hook, in the track of outward and inward bound vessels, and where their presence might reasonably have been expected. It was, therefore, her duty to exercise the utmost caution. Our rules of navigation, as well as the British rules, require every steamship, when in a fog, "to go at a moderate speed." What is such speed may not be precisely definable. It must depend upon the circumstances of each case. That may be moderate and reasonable in some circumstances which would be quite immoderate in others. But the purpose of the re-

quirement being to guard against danger of collisions, very plainly the speed should be reduced as the risk of meeting vessels is increased. In the case of *The Europa*,\* it was said by the Privy Council: " This may be safely laid down as a rule on all occasions, fog or clear, light or dark, that no steamer has a right to navigate at such a rate that it is impossible for her to prevent damage, taking all precaution at the moment she sees danger to be possible, and if she cannot do that without going less than five knots an hour, then she is bound to go at less than five knots an hour." And we do not think the evidence shows any necessity for such a rate of speed as the steamer maintained. It is true her master, while admitting she was going seven knots, states that he don't consider she could have been steered going slower—could not have been steered straight. And two other witnesses testify that, in their opinion, she could not have been navigated with safety and kept under command at a less rate of speed than seven miles an hour. These, however, are but expressions of opinions based upon no facts. They are of little worth. And even if it were true that such a rate was necessary for safe steerage, it would not justify driving the steamer through so dense a fog along a route so much frequented, and when the probability of encountering other vessels was so great. It would rather have been her duty to lay to. But there is the evidence of one who had been a shipmaster, and who once crossed the Atlantic as a passenger in this steamer. He states that on the passage she did not, to the best of his knowledge, average over four knots during twenty-four hours, and that he noticed no difficulty in her steerageway at that low rate of speed. As he was in the habit of going to sea he would probably have noticed difficulty if there had been any. This is a fact of more weight than any mere opinions unsupported by observation or trial. We think, therefore, it must be concluded that the steamer was going at an undue rate of speed, and that it was her fault that she came into a position from

---

\* Jenkins's Rule of the Road at Sea, 52.

which she could not, or certainly did not, escape without colliding with the bark.

It is next to be considered whether any fault of the bark contributed to the collision. That she was in fault is beyond controversy. She was in plain violation of the rules of navigation, which required her to blow a foghorn. Both our own and the British shipping acts enact that sailing ships, when under way, shall use a foghorn, and, when not under way, shall use a bell. The British merchants' shipping acts expressly declare that owners and masters of ships shall use no other fog signals than such as are required by the regulations, and that if in any case of collision it appears to the court before which the case is tried that such collision was occasioned by the non-observance of any regulation made by the act, or in pursuance thereof, the ship by which the regulation has been infringed shall be deemed to be in fault, unless it is shown to the satisfaction of the court that the circumstances of the case made a departure from the regulation necessary. Our own statute does not contain this provision expressed, but its meaning is the same. The bark in this case was a British ship, as was the steamer. She was under way, moving slowly, indeed little, if any, more than a mile an hour, with her helm lashed three-quarters to port, but on her starboard tack, carrying two close-reefed topsails, foresail, foretopmast and mizzen staysails, and with no sails aback, so far as it appears. She was constantly changing her position. It was her duty, therefore, to blow a foghorn, and not to ring a bell. By ringing a bell, as she did, she gave a false signal, and, so far as she could, assured all approaching vessels that she was not under way. There is some evidence that a bell can be heard as far as can a foghorn, and some that it can be heard farther. On the other hand there is evidence that a foghorn can be heard farthest. However this may be the bark had no right to substitute any equivalent for the signal required by the navigation rules. In the case of *The Emperor*,* it was said, "It is not

---

* Holt's Rule of the Road, 88.

advisable to allow these important regulations to be satisfied by equivalents, or by anything less than a close and literal adherence to what they prescribe." In addition to this it may be remarked that a bell can never be an equivalent for a foghorn. It gives different information. Both may notify an approaching vessel that the signalling ship is in the neighborhood, but the one gives notice that the ship is moving, and the other that the ship is stationary.

Concluding then, as we must, that the bark was in fault, it still remains to inquire whether the fault contributed to the collision, whether in any degree it was the cause of the vessels coming into a dangerous position. It must be conceded that if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration. The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute. In the case of *The Fenham*,* the Lords of the Privy Council said, " It is of the greatest possible importance, having regard to the admiralty regulations, and to the necessity of enforcing obedience to them, to lay down this rule: that if it is proved that any vessel has not shown lights, the burden lies on her to show that her non-compliance with the regulations was not the cause of the collision." In some cases it is possible to show this with entire certainty. In others it cannot be. The evidence in the present case leaves it uncertain whether if a foghorn had been blown on the bark, it would not have been heard sooner than the bell was heard, and thus earlier warning

---

* 23 Law Times, 329.

have been given to the steamer—seasonable warning to have enabled her to keep out of the way. It was not without reason that the statute required a foghorn for ships under way, and a bell for those not under way. The legislature must have known it was important ships should have the earliest possible notice of the proximity of other moving vessels. They might be approaching each other. If so, they would come together sooner than they could if one of them was not under way. It may be assumed, therefore, that the legislature acted under the conviction that a foghorn could be heard at a greater distance than a bell, and required the use of one rather than that of the other for that reason. To go into the inquiry whether the legislature was not in error—whether in fact a bell did not give notice to the steamer that the bark was where she was as soon as a foghorn would have done—is out of place. It would be substituting our judgment for the judgment of the lawmaking power. It would be admitting the validity of an equivalent for that which the statute has made a positive requirement. Then how can it be shown on the part of the bark that the failure to use a foghorn certainly contributed in no degree to the collision? How can it be proved that if a foghorn had been blown those on board the steamer would not have heard it in season to have enabled them to check their speed or change their course, and thus avoid any collision? Though there were two lookouts on the steamer, each in his proper place, the bark's bell was not heard until the vessels were close upon each other. Who can say the proximity of the vessels would not have been discovered sooner if the bark had obeyed the navy regulations? If it be said this is speculation, it may be admitted, but it is speculation rendered necessary by a certain fault of the bark. It is equally speculative to conclude that the collision would have taken place if a foghorn had been used instead of a bell, and infer therefrom that the fault of the bark had no relation to the disaster. The truth is the case is one in which, while the presumption is that the failure to blow a foghorn was a contributory cause of the collision,

and while the burden of showing that it was in no degree occasioned by that failure rests upon the bark, it is impossible to rebut the presumption. It is a well-known fact that in some states of the atmosphere a foghorn can be heard at much greater distances than in others. How far it could have been heard when this collision occurred can never be known. Nor can it be known what precautions the steamer would have adopted if the true and proper signal had been given her. Hence, it appears to us the bark has not proved that her failure to obey the shipping regulations was not a concurrent cause of the injury she received; and, consequently, as both vessels were in fault, the damages, according to the admiralty rule, should be divided.

We have not overlooked the fact that in a libel by the owners of the cargo of the bark against the steamer for damages resulting from the same collision, it was held by the judicial committee of the Privy Council in England, that the disaster was chargeable to the steamer alone. But with great respect for the tribunal that thus decided, we do not feel at liberty to surrender our judgment, especially in view of the fact that the case is now more fully presented and the evidence is more complete than it was in the British court.

Decree reversed, and the cause remanded with instructions to enter a decree

In accordance with this opinion.