JOHN B. BOWMAN

*v.*

BARTHOLOMEW LONG.

1. DEFINITIONS—*legal representatives defined.* The term, "legal representatives," in its strict and literal acceptation, means executors or administrators, but it is frequently used in a different sense, even in statutes, as well as in wills, deeds, contracts, etc.; and the question of intention is to be considered in its construction—not gathered solely from the instrument itself, but, in part, from concomitant circumstances and the existing state of things, and the relative situation of the parties to be affected by it.

2. CONTRACT FOR TITLE—*exception as to "legal representatives."* Where a party, for a consideration, covenanted to warrant and defend the title of another in a town lot against the claims of all persons, except those of A B and his legal representatives, it was *held,* that the term, "legal representatives," included the person succeeding to the claims A B then had, whether as heir, devisee, grantee or assignee, and not to his executor or administrator, who could take no interest in the land, or to any claim which A B might subsequently acquire.

3. CONTRACT—*rule of construction.* A familiar rule of interpretation requires that we shall give force and effect to all the words employed by the parties in expressing their agreement, when such is possible.

. APPEAL from the Circuit Court of St. Clair county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

Mr. R. A. HALBERT, for the appellant.

Messrs. G. & G. A. KŒRNER, for the appellee.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

John Conway was in possession of lots 161 and 162, in block 10, of that portion of the present city of East St. Louis which was laid out and formerly known as the town of St. Clair. At his request, John B. Bowman purchased an outstanding title, which was supposed to be paramount, to lot 162, and took the title in his own name, agreeing to convey to Conway upon being repaid the money he advanced in purchasing that title. Bowman was empowered by Conway, as his attorney in fact, to make sale of the lots.

Accordingly, on the 13th of May, 1865, Bowman made a contract with Bartholomew Long for the sale of the lots to him, which was reduced to writing and delivered two days afterwards, on the 15th of May. By this agreement, the title to lot 162 was to be conveyed by "a clear deed, fully warranted"—that to lot 161 was to be only by deed conveying "the title heretofore held by one John Conway, free from all claims under and by him."

On the same day that this instrument was delivered, but afterwards, Bowman agreed with Long, in consideration of $100,—$50 of which was paid at the time,—to warrant the title to lot 161 to Long, "against the claims of Louisiana St. John, and all other persons, except those of James Ewing and his legal representatives," which agreement was indorsed on the instrument evidencing the sale of the lots.

On the 5th of April, 1866, Long having made full payment of the amount due on the purchase of the lots, and on the agreement of Bowman to warrant the title to lot 161, deeds were executed and delivered to Long, in conformity with the

agreement of the 13th of May, 1865; and Bowman, also, then delivered to Long his covenant of warranty, as follows:

"*Know all men by these presents,* That I, John B. Bowman, for and in consideration of $100 to me in hand paid by Bartholomew Long, of East St. Louis, Ill., the receipt whereof is hereby acknowledged, by these presents covenant and agree to warrant and defend the title of the said Bartholomew Long in and to said lot 161, of block No. 10, of the town of St. Clair, in the county of St. Clair, and State of Illinois, which he, said Long, acquired from one John Conway by deed of even date herewith, against the claims of all persons, except those of one James Ewing and his legal representatives.

"In witness whereof, I have hereunto set my hand and seal, this 13th day of May, A. D. 1865.

"JOHN B. BOWMAN.  [SEAL.]"

Long, claiming to have been evicted from lot 161 by virtue of a judgment, under a paramount title, in favor of Louisiana St. John, brought his action of covenant on this warranty.

The judgment of the court below was in favor of Long, and Bowman brings the case here by appeal.

There is but a single question, among the many discussed, which we deem it important to consider.

On the trial, Bowman offered to prove (specifying the conveyances relied upon) that the title, by virtue of which Louisiana St. John obtained judgment against Long and evicted him from lot 161, was derived from James Ewing, and vested in her on the 21st of June, 1865, and not recorded until September 13, 1875. The court rejected the evidence, holding, as the record shows, that the words, "legal representatives," do not include assignees or grantees.

If this construction can be sustained, the rejection of the evidence offered was proper; otherwise, it was erroneous.

The term, "legal representatives," in its strict and literal acceptation, means executors or administrators, but it is frequently used in a different sense, even in statutes, as well as in wills, deeds, contracts, etc.; and it is, therefore, held that

the question of intention is to be considered in its construction, "and that this is not to be gathered solely from the instrument itself, but, in part, from concomitant circumstances and the existing state of things, and the relative situation of the parties to be affected by it." *Delaunay* v. *Burnett*, 4 Gilm. 494; *Phelps* v. *Smith*, 15 Ill. 572; *Warnecke* v. *Lembca*, 71 id. 91.

In the first two of the above cases, claim was made under an act of Congress, whereby was granted the right of pre-emption to "each and every person, or his, her or their legal representative or representatives," etc.; and it was held that the assignee .or purchaser was the legal representative of the person entitled to the pre-emption; and in the last case it was held, under a bill filed to redeem from a sale made under a trust deed, that the words contained in the deed providing that, on the application of the legal holder of the notes secured, "John Ranscher, or his legal representative," should advertise, sell and convey the land, as the attorney of the grantor, did not authorize the administratrix to advertise, sell and convey. The land department and courts of the United States, in cases affecting purchases or confirmations of titles from the United States, uniformly construe the words, "legal representatives," in certificates for patents, etc., as embracing heirs where there has been no transfer, and assignees or grantees where there has been a transfer.

This is fully shown by Mr. Justice NELSON, in delivering the opinion of the court in *Hogan* v. *Page*, 2 Wallace, 607. He says: "A difficulty had occurred at the land office, at an early day, in respect to the form of patent certificates and of patents, arising out of applications to have them issued in the name of the assignee or present claimant, thereby imposing on the office the legal burden of inquiring into the derivative title presented by the applicant. This difficulty also existed in respect to the boards of commissions, under the act of Congress, for the settlement of French and Spanish claims. The result seems to have been, after consulting the Attorney Gen-

eral, that the Commissioner of the Land Office recommended a formula that has since been very generally observed, namely: the issuing of the patent certificate, and even the patent to the original grantee or *his legal representatives;*" and the same has been adopted by the several boards of commissioners.

"This formula, 'or his legal representatives,' embraces representatives of the original grantee in the land by contract, such as assignees or grantees, as well as by operation of law, and leaves the question open to inquiry in a court of justice as to the party to whom the certificate, patent or confirmation should enure." See, also, *Carpenter* v. *Russell,* 19 Wall. 137.

It is quite evident that if we shall say "his legal representatives," as used in this covenant of warranty, are to be taken, only, in their strictly primary legal signification, as meaning executors or administrators, they are nonsensical, and add nothing whatever to the preceding words; for by no legal possibility could the executors or administrators, simply as such, have an interest in the title that would enable them to recover possession of the lot through legal proceedings.

Assuming his title to be paramount, Ewing could evict Long, and, by will or deed, he could invest his devisees or assignees with his title, and this would enable them to do so, or, dying intestate, the law would invest his heirs with such title; but it is legally impossible that any one else could, in right of Ewing's title, legally evict Long. A familiar rule of interpretation requires that we shall give force and effect to all the words employed by the parties in expressing their agreement, when this is possible. We are, therefore, to assume that by the employment of the words, "his legal representatives," some idea was intended to be conveyed which was not conveyed by the previous words. What was that idea? It will be observed the warranty excepts "the claims of James Ewing," etc., in the present tense—that is to say, the claims which James Ewing then had. The warranty was antedated, to agree with the date when the actual agreement between the parties was made; and it is obvious that it was a particular

title, or claim of title, which was in the minds of the parties. It is not to be supposed that Long would have been willing to pay the amount he did for the warranty, with the understanding that it could be defeated by the subsequent conveyance of outstanding titles to James Ewing, or that Bowman would have been willing to assume the obligations imposed on him by the covenant of warranty, with the understanding that his exception of the claims of James Ewing could be defeated by the conveyance or death of Ewing.

Long had apprehensions in regard to the claims of Louisiana St. John. Bowman was willing to warrant against these, but he had apprehensions in regard to the claims of James Ewing, against which he was not willing to warrant. Long, however, was willing to take his chances against these claims, and thus the agreement was made. It is manifest these apprehensions were not as to the person, for St. John's title conveyed to Ewing, or Ewing's title conveyed to St. John, would be just as formidable as in the respective grantors; and so it would be if passed by operation of law or act of parties to other persons. Long, obviously, paid to be protected against the claims of everybody, except those then existing in James Ewing, and Bowman as obviously excepted those claims from his covenant of warranty.

Of what moment could it be to except as to the claims of James Ewing, if the exception did not include all to whom those claims might pass—whether by act of parties or by operation of law? Ewing might die at any moment, and there was no restriction on his right of alienation. The man, divested of all claim of title, could excite no apprehension; and the title, without regard to its owner, if paramount, would always authorize an eviction of Long. In a certain sense, those who legally succeed to the title are, in fact, the legal representatives of the person from whom it is derived—that is, they legally succeed, and thus represent him as owner of the title; and we can not, under the circumstances, doubt that this

is the sense in which the term, "legal representatives," is here employed.

There can be no question, if we are right in our construction, that the claims of Ewing excepted against were those existing on the 13th of May, 1865. This was the time of the making of the contract, and the parties made the formal covenant of warranty, though executed subsequently, to bear that date. It is, by the effect of their agreement, to be construed as operative at and from that date. It is, therefore, immaterial whether the Ewing claims were conveyed to St. John prior or subsequent to the formal execution of the covenant of warranty. It is sufficient if they were not conveyed when the agreement between the parties was made, from which date they intended the covenant to become operative.

The court erred in rejecting the evidence offered, and for this error the judgment must be reversed and the cause remanded.

*Judgment reversed.*