**THE D NO. 22.**
**THE SEGUNDO.**
**THE ARIOSA.**

Nos. A—15614, 15764.

District Court, E. D. New York.

May 28, 1940.

Purdy & Lamb, of New York City (John E. Purdy, of New York City, of counsel), for libelant.

Haight, Griffin, Deming & Gardner, of New York City (Henry M. Hewitt and James McKown, Jr., both of New York City, of counsel), for Ivarans Rederi and the Segundo.

Hagen & Eidenbach, of New York City (Charles W. Hagen and Henry C. Eidenbach, both of New York City, of counsel), for the Ariosa.

BYERS, District Judge.

These causes were tried together since they involve but a single collision between the motor vessel Segundo and the dump scow D No. 22 on December 7, 1938, at about 3 p. m., in the North River about 400–500 yards off the northerly end of the Battery.

The libel is that of the owner of the scow, against the Segundo, which impleaded the steamtug Ariosa which was towing the D No. 22. That is the first cause. In the second, a cross-libel was filed by the owner of the Segundo against the steamtug Ariosa and her owner, to recover part of the Segundo's damages.

The object of the controversy, from the standpoint of the Segundo is to reduce her liability to half damages in the first cause, and to recover a like proportion in the second, since her own fault is pleaded and was conceded at the trial. The scow D No. 22 and the Ariosa are of common owner-

ship, but were separately represented at the trial, because of underwriting exigencies.

The Segundo is a twin-screw motor vessel, 367 feet long by 53½ in beam and, as she was partly laden, her mean draft was 19 feet. At 2:40 p. m. on this day, she backed out of the north side of pier 7, Jersey City, with two assisting tugs, on her starboard side near the bow and stern respectively. She was bound for Philadelphia, and in order to get on her course to sea (because of shoal water downriver) she had to head up the stream, and proceed on that heading sufficiently to accomplish a full turn to starboard.

This was attempted but, before completion and while the Segundo was heading across the river, she managed to pass between the Ariosa and the head scow in her tow, D No. 22, breaking the towing hawser, and thus causing the scow to strike her port side at about No. 2 hatch, which is some 45 feet aft of her bow.

The approximate place of the collision— on the New York side of the center of the river—is not in dispute; nor is the time, which was about 3 p. m.; nor are the physical conditions. The day was clear, with an ebb tide running, of 2½ miles, and southerly wind of negative effect, and visibility was good.

The Segundo's faults were numerous and glaring, but for her the argument is pressed that she was not alone to blame, but that the Ariosa must also be held, and the fault attributed to her is her conceded failure to blow a whistle signal to indicate a starboard passing; it is urged that, had she done this, the Segundo would have become aware of her presence sooner than she did, in which event it is to be supposed that she would have done something to avoid the collision. What she would have done, and when, and the degree of success which would have rewarded her efforts, are manifestly matters of conjecture or hindsight.

Her proctors urge that the said avowal of fault at once diverts attention from the Segundo to the Ariosa, and that the showing for her invites condemnation in the respect stated.

Pursuit of that inquiry requires that we recur to the navigation of the Segundo, because upon what she did depends the asserted duty of the Ariosa to use whistle signals, prior to the alarms which she blew.

The descending tow consisted of the Ariosa, 118 feet long, of 750 horse power, and, at the end of a 200-foot hawser on a bridle from the tug, three 115 feet by 42 feet wooden scows, close coupled, drawing about 12½ feet, leaving 2½ feet of freeboard—thus accounting for about 670 feet of tow over-all. That flotilla had made up at Edgewater, N. J., at about 1:45 p. m., whence departure was had, bound to sea where the scows were to be dumped.

Proceeding down the river with the tide under foot, speed over the ground was about 6 miles per hour; a center river course was followed without incident, and when about at pier 13 North River near Cortlandt Street, the navigator of the tug observed the Segundo on the New Jersey side, headed up the river—as he testified.

That is in accord with the Segundo's narrative as to her initial heading, once the undocking tugs had let go. Her Sandy Hook pilot says that he took over when she was about 800 feet off from pier 7, Jersey City, and she was headed about northeast "in line with the pier ends".

Such a heading would point the vessel in the general direction of pier 13, North River.

The two vessels were then apart some 3,000 feet, a little better than one-half a nautical mile, and were not screened by intervening vessels.

The ship never blew any passing or course signal to the tug, but urges that the latter was required to blow something, probably two blasts for a starboard passing, since the tug assumed that the ship was proceeding up the river.

By a plausible calculation which is generally in accord with the testimony, the time when the Ariosa first saw the Segundo, in the positions stated, is approximated at 2:56½ p. m. and, if that be tentatively assumed, the result is that in the ensuing 4 minutes the two vessels moved toward the place of collision, without the exchange of signal communications.

If this be granted for argument, the method of approach becomes important. As to the tug, her course was maintained until the Segundo was realized to be close aboard, heading into the Ariosa at about 400 to 500 feet on her starboard hand, when the first alarm was blown.

The critical question is thus exposed: Did the Segundo continue on her first observed heading, while the Ariosa was cover-

ing the 2,500 feet or so during which she blew no signal?

Recurring now to the navigation of and seamanship displayed by the Segundo, the following appears:

A. The master did not instruct the 1st officer or any of the men with him on the forecastle head to act as lookout. They were there, and he assumed that they would so function under orders from the mate.

The assumption proved to be misleading, so far as the tug is concerned, for no report of her was made to the bridge.

The significance of that omission cannot be ignored, as the evidence is presently understood, because it is entirely compatible with the vacillating course of the ship from the time her turning maneuver was undertaken; had she maintained a consistent and steady turn, it is inconceivable that some one of those whose duty it was to act as lookout would have failed to report the Ariosa and her tow to the bridge. It was inevitable that, as the ship's heading veered sluggishly, first, to starboard, then stopped and briefly receded, and then sagged generally across the river, the men on her bow might well be in doubt as to the range of their required observations.

B. The helm was not aiding the ship in the effort to turn. The pilot so observed, and the log contains an entry that after the collision a helper tug reported that the rudder was observed to "lay amidships" while the ship was turning. It is supposed that this means it was in a fore and aft position, although right rudder had been signaled from the bridge. Probably that report cannot be accepted as legal evidence of the fact, and it is not referred to in that sense. It is a log entry, not based upon actual observation by one of the ship's company; nor was the man called as a witness who is said to have made the statement; perhaps the entry is not strictly corroborative of anything, but it is at least consistent with what both the master and the pilot testified, namely, that there was trouble with the helm, and that the ship "seemed sluggish" under a right rudder, as the pilot noticed at 2:48 and 2:53 p. m.

Routine tests of the steering gear had been made just prior to undocking, and no mechanical failure was then observed, but the evidence leaves no room to doubt that the ship had to rely upon her twin screws to regulate her course, more than would have been the case in the absence of helm trouble.

C. The engine movements disclose that a consistent turning was not maintained. They were as follows:

| Time | Port Engine | Starboard Engine |
|---|---|---|
| 2:44 | | Slow astern. |
| 2:45 | Slow astern. | |
| 2:46 | Stop. | Stop. |
| 2:47 | | Half ahead. |
| 2:48 | Half ahead; Full ahead. | |
| 2:50 | Slow ahead. | Stop. |
| 2:51 | Half ahead. | |
| 2:53 | | Half astern. |
| 2:54 | | Stop; half ahead. |
| 2:55 | | Full ahead. |
| 2:56 | Full ahead. | Slow ahead. |
| 2:57 | | Stop. |
| 2:58 | | Full astern. |
| 3:00 | Full astern. | |
| 3:01 | Stop. | Stop. |

The Segundo was backed out into the stream and both engines were stopped at 2:46. It is inferred from the testimony that the assisting tugs turned her and completed their work at 2:47, when the starboard engine was put half ahead.

Apparently that was the pilot's first order, although he is not sure. That movement would incline her head to port, upriver; the extent of the inclination would depend upon the effect of the helm, and the pilot said that "the wheel was right at all times". Probably the best that can be made of the testimony is that the rudder helped but little and so the heading of the ship at that time was probably up rather than across the river.

At 2:48 both engines were half ahead; then the port engine was put into full ahead, which ought to have held the ship steady, as she gained the necessary speed to start her turn, which would be made against an ebb tide. She so progressed for two minutes and then her starboard engine was stopped, and the port engine was put into slow ahead. Thus was the turn begun, and from Bouchard's observation (made from his office window on the eleventh floor, 17 Battery Place, New York) the Segundo was then just above the Jersey Central ferry racks.

At 2:51 the port engine was half ahead, the starboard engine stopped, and the turn to starboard was thus continued, and assisted at 2:53 by half astern on the starboard engine, which was the movement

until 2:54 when the starboard engine was stopped and then put half ahead, which also continued to be the movement of the port engine; that must have arrested the turn and in the next minute the starboard engine was full ahead against the port engine at half ahead, and then at 2:56 both engines were in ahead motion, the port full and the starboard slow, which should have arrested the impulse to port begun at 2:54 and increased during the ensuing minute. This was more than a brief halt in the turn; it is not to be confused with passing a carfloat which the pilot said was accomplished by a starboard turn.

The ship's heading in that interval was observed by Bouchard to be: "* * * the Segundo · * * * started to come around to starboard, and then she went back up * * * as if the pilot or captain was afraid of getting down on the tows anchored a little east of the Ellis Island flats. That is what it looked like to me. When she got abreast of the Jersey Central float bridges she hauled across the river." He said that before the ship made the turn the latter and the Ariosa were never anything else than starboard to starboard.

At 2:57 the starboard engine was stopped and at 2:58 was put full astern, while the port engine continued full ahead. Thus the turning was resumed and accelerated at 2:58 when the starboard engine was put full astern. That movement continued for two full minutes, and the criticism leveled at the Ariosa for not giving a whistle signal seems to require attention at this juncture, for the first time.

Certainly the tug is chargeable with knowledge at 2:58 that the Segundo was then making a starboard turn, and a starboard passing signal then would have been idle at best, and probably confusing and entirely misleading. An alarm was required if it could be seen that the ship was not likely to complete her turn at or about the middle of the river, which is about one-half mile wide off the Battery.

It is the pilot's testimony that with effective helm response the ship should turn as she was maneuvered in about one-quarter of a mile, which would mean that she would not encroach much on the Manhattan side in order to get on a steady course to sea; that naturally would depend on the distance off the pier ends at which the turn was started. Her capacity so to turn was lessened on this occasion by her sluggish helm.

The question then is: What duty may be fairly assigned to the Ariosa, under all the circumstances which have been related, to understand that the Segundo could not complete her turn by mid-river, and when did the duty arise to do all that was possible to avoid the collision?

Since the time of impact was 3 o'clock and the alarm was blown at a distance of about 500 feet, the time of the latter was probably about 2:59 or a few seconds later. The delay then was of about one minute, during which time the tug probably progressed about 530 feet, or better than a length of the Segundo by say 60 feet.

Assuming, without finding, a lag in the reflexes of Sorensen, the tug's navigator, of the indicated duration, is it fair to conclude that the delay of about one minute in blowing the alarm can be said to have contributed to the happening?

A negative answer to this question results from these considerations: The arc of the ship's turn could not be accurately forecast from the tug's pilot-house, because of its demonstrated uncertainty; the ship's maneuvers were sufficiently misleading to conceal her inability to turn continuously, by which is meant that the sluggish helm caused her to continue toward the New York side rather than to continue her starboard turn, and nothing that could be observed aboard the tug constituted a warning that the Segundo was under only partial control.

This means that the alarm was blown as soon as the tug was chargeable with notice that the ship would continue into the expectable path of the tow.

The Segundo dropped her port anchor to 15 fathoms as soon as possible after the tug blew her first alarm, and at once blew 3 blasts to indicate the full astern engine movement at 3, but the anchor did not hold, the Segundo continued across the hawser of the tow as has been stated, and thus the harm was done.

The tug was, at all times here involved, on the New York side of the center of the river, and it is not seen how she can be held for part of the damages.

It is faintly urged that this can be treated as a case of special circumstance,

but no serious attempt is made to demonstrate that position. The lapse of time and the distance covered from pier 7, Jersey City, not to mention the ship's movements, dissipate such an argument.

The witness Bouchard happens to hold a master's license, and his observations were convincing for two reasons: He had delivered part of the Segundo's cargo and had watched her back out of the slip; also, he took the stand without being exposed to the process of rehearsal of his testimony under the discerning eye of alert proctors in admiralty.

He observed the tow coming down the river in the tide, favoring the Manhattan shore, and said she blew alarms "as soon as she saw the ship coming for her".

This from a disinterested witness, whose practical insight into such matters cannot be ignored.

The Segundo leans heavily on Pilot Rule III: "The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in' compliance with these rules, not only when meeting 'head and head', or nearly so, but at all times when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

It is true that these vessels were about one-half of a mile apart when the Ariosa was off pier 13, North River, and since the river is of about that width, a passing signal from the tug would have been in compliance with the foregoing, if by any process these vessels were deemed to be headed for a passing, which is quite foreign to the evidence.

The rule was enforced in The Papoose, 1934 A.M.C. 993, where the colliding vessel was on the wrong side of the channel, but the Moore, which was struck, had failed to adhere to the above rule, and accordingly both were held, since they were headed to pass.

Reliance in part was had upon The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, in which the second vessel had not shown that her fault could not have been one of the causes of damage.

It seems to me that the Ariosa meets that test, if Pilot Rule III were thought to apply, which is not the present holding, for nothing appears in this testimony to suggest that a two-whistle signal blown by her from the vicinity of pier 13, North River, would have received attention on the Segundo, or affected her handling if it had been observed. The turning effort was arrested, as has been stated, at 2:56 and according to the testimony of Bouchard the Segundo was then going "back up" the river. It is sheer conjecture to say that the ship would have so continued, had the Ariosa then blown a starboard passing signal. It would depend of course upon the understanding then existing on the bridge of the Segundo as to the extent to which her ability to turn was impaired by the failure of the helm to function. True, the pilot says that, if he had seen the tug, he would have blown one blast that he was turning to starboard, or' stopped the ship to let the tug go by; so it is fair to say that, if he had learned of the presence of the Ariosa and her tow in the river, by her signal, he would have done either of those things.

However, the evidence teaches this court that there was such preoccupation on the Segundo, that a signal from the Ariosa would not have accomplished any purpose touching the latter's handling at any time before the alarm was blown.

The cross-libelant also charges fault in that the alarm was not blown soon enough by the Ariosa. That subject has been discussed. I think the alarm was blown in conformity with Rule I of the Pilot Rules, as soon as the tug's navigator was actually unable "to understand the course or intention" of the Segundo.

The foregoing is intended to embody the findings, although not as tersely as could be desired. If a more itemized summary is deemed requisite, such may be settled with the decrees.

In the first cause, the libelant may have the usual decree with costs against the Segundo. The impleading petition will be dismissed without costs.

In the second cause, the cross-libel is dismissed without costs.