**GULF ATLANTIC TRANSPORTATION COMPANY**

v.

**THE Diesel Tanker F. L. HAYES, her engines, tackle, apparel and furniture, etc.**

**TANK BARGE HYGRADE, Inc., as owner of the Diesel Tanker The F. L. Hayes**

v.

**THE Tug GATCO–NEW JERSEY.**

Nos. 247, 291 of 1951.

United States District Court
E. D. Pennsylvania.
April 17, 1956.

Krusen, Evans & Shaw, Philadelphia, Pa., by Timothy Jay Mahoney, Jr., and Mark Alspach, Philadelphia, Pa., for Gulf Atlantic Transportation Co.

Rawle & Henderson, Philadelphia, Pa., by Thomas Mount, and Robert A. Hauslohner, Philadelphia, Pa., for Sinclair Refining Co.

Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., by Benjamin F. Stahl, Jr., Philadelphia, Pa., and Foley & Martin, New York City, by John H. Hanrahan, New York City, for Tank Barge Hygrade, Inc.

KIRKPATRICK, Chief Judge.

These actions in admiralty result from a collision which occurred at 11:00 P.M. on August 11, 1951, in the Delaware River. The exact place of the collision is in dispute but all agree that it took place slightly to the east of the 800 foot wide channel and not far from the junction of Reedy Island and Baker Ranges. Reedy Island is the upper of the two ranges and it runs in a southeasterly direction, making an angle with Baker Range next below it which runs about due south and which is 1.65 miles long. There is plenty of water to the east of the channel on both ranges. There is a flashing buoy 2R at the east side of the channel in the angle between the ranges and another, 4B, on the east side of Baker Range possibly three-fourths of a mile further down.

Shortly before the collision, the tug Gatco New Jersey, with a barge made up

ahead of it on a pushing gear, was descending Reedy Range at a speed of about 6 knots, and the Hayes, a 240 foot tanker, was entering the lower end of Baker Range, heading upstream and making 9 knots. These were the vessels involved in the collision. Coming up the river behind the Hayes was a larger and faster tanker, the Havmann, making 13 knots. At a point approximately opposite the 4B buoy, the Havmann passed the Hayes on the latter's port side. When the Hayes, following the Havmann, had just about passed the 4B buoy, the tug with its tow, which had been coming down the river outside and slightly to the east of the Reedy Island Range channel, turned into that channel, in order to have the 2R buoy on its port side when it rounded it, intending to go outside the channel on the east again in order to make a short cut to its destination. The Hayes was then close to the east side of the Baker Range channel and the Havmann well past the Hayes and about in midchannel.

Captain Gilliland of the tug testified that he rounded buoy 2R at a distance from it of 25 to 30 feet and immediately steered his vessel out of the channel and started down along its eastern side. Other evidence in the case, however, leads me to the conclusion that the tug and barge as they passed the buoy were a good deal further out into the channel than Gilliland thought. Apart from what was observed by the witnesses on both the Hayes and the Havmann, the fact that Gilliland elected to turn back into the channel in order to pass the buoy on his port side because he was afraid that the tide would set him against the buoy, suggests that the tide was strong enough not to allow him to turn his rather unmaneuverable tow as sharply as he said or thought he did. I, therefore, find that, after it turned into Baker Range, the tug was well into the channel and that it continued in the channel, although constantly nearing its eastern side until the collision, which occurred just about on the east side of the channel.

Coming up Baker Range, Captain Welde of the Hayes saw the Gatco round the buoy—that is, he first saw her red side light which promptly turned to red and green, thus placing her dead ahead of him. He immediately blew a one-blast signal indicating that he intended to take or maintain a course to the Gatco's port. There was no reply from the Gatco, and the vessels continued to approach head and head. The Havmann, ahead of the Hayes, passed between the Hayes and the tug, the tug was momentarily out of Welde's sight[1] and when she reappeared she was still heading straight for him, apparently having ignored his one-blast signal. Welde then blew another one-blast signal, at the same time putting his rudder hard right in order to avoid a head and head situation and at the same time carry out his announced intention of making a port to port passing. His signal was answered by two blasts from the Gatco and almost immediately the Gatco's red light disappeared, indicating that she was swinging to port directly across the course of the Hayes. Welde then gave three blasts, put his ship full astern and gave the alarm signal to his crew. At the same time, the Gatco blew the danger signal, but within a minute of this last exchange, the vessels collided, the bow of the Hayes, which was light loaded, running diagonally over the deck of the barge which was low in the water.

 The foregoing statement represents, not merely Welde's testimony, but my findings of fact. The testimony of Captain Gilliland of the Gatco is quite different and, if accepted, would come near to absolving him from fault and would certainly convict the Hayes of navigation so strange as to be almost inexplicable. However, in view of the cor-

---

1. If the tug left the channel immediately upon rounding the buoy as Gilliland testified, the Havmann could not have passed between her and the Hayes. It certainly looks as though the tug had got pretty far out into the channel before she turned.

roboration of Captain Welde on many of the essential points by wholly disinterested witnesses, I am unable to accept Gilliland's story.

On the facts as found, the fault of the Gatco is obvious and inexcusable. Captain Gilliland, from beginning to end, proceeded exactly as though there were no other vessels on the river. This would have been understandable, if not entirely correct, had he been outside the channel to the east, except momentarily in rounding the 2R buoy, as he testified. I cannot doubt, however, that he was well in toward the middle of the channel when he got the Hayes' one-blast signal. He never answered this, nor for that matter any other signal either from the Havmann or the Hayes, until he gave his last minute double blast just before the collision. He testified that he did not hear any signal from the Hayes or Havmann, but I cannot accept this statement. The two witnesses from the Havmann who were not particularly interested in the manner in which the Hayes, back of them, passed the tug (as Gilliland should have been) plainly heard the first one-blast signal from the Hayes. I am satisfied that Gilliland got the one-blast signals from the Hayes when he was in the channel and he could and should have assented to a port to port passing. Instead, intending to go out of the channel to the east in order to shorten his course, he persisted in complete disregard of the narrow channel rule, the passing signal rule and the principles of safe navigation, apparently relying on the Hayes to abandon her lawful course and keep out of his way by swerving to port.

The fault of the Gatco being clear, the question arises whether the Hayes was also guilty of fault such as would require a division of the damages.

After his one-blast signal, Captain Welde continued on for a full minute without reducing his speed and then gave his second single blast. The vessels were then approaching each other, head and head, at a combined speed of 15 knots.

Article 18, Rule III, of the Inland Navigation Rules, 33 U.S.C.A. § 203, provides "If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle." In Socony Vacuum Transp. Co. v. Gypsum Packet Co., 2 Cir., 153 F. 2d 773, 777, and James McWilliams Blue Line v. Card Towing Line, 2 Cir., 168 F. 2d 720, 721, Judge Hand ruled that where a passing signal has not been answered, the giving of a second such signal, instead of the danger signal, establishes a violation of this rule. He said that "to repeat an invitation for a passing or a crossing inevitably presupposes that the inviting vessel is 'in doubt' as to the 'intention' of the other", McWilliams case, supra, at page 721. In other words, if a second signal is required, it can only be because there is doubt as to whether the first one was understood and in that situation a danger signal is required by the rule.

There is no question that the negligence of the Gatco was gross and was a much larger factor in bringing about the collision than anything which Captain Welde did or omitted to do. However, under the circumstances of this case, I am unable to give the Hayes the benefit of the rule of The Ambridge, 4 Cir., 42 F.2d 971, 976, that "Where, as here, the fault of one vessel is clearly established, the evidence of the other vessel's fault must also be clear and convincing in order to make out a case for apportionment of damage." See also The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053. The trouble is that under Judge Hand's view (to which I subscribe) the evidence is clear and convincing that there was a violation by Captain Welde of a statutory rule and, under the rule of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, where there is a violation, affirmative evidence that it was the cause of the collision is not required in order to fix liability upon the

transgressor. The burden is upon one who has failed in respect of a statutory duty to show not only that his failure probably did not contribute to the collision but that it could not have contributed to it, and I cannot find that, had Captain Welde blown the danger signal and immediately backed, Captain Gilliland would not have desisted from his intended course and taken action which could have avoided the collision.

Captain Welde's conduct, if not excusable, was at least understandable. As Judge Hand said in the McWilliams case, supra, "No doubt an effort to force an assent to a proper invitation is natural enough; resolute men find it hard to give in before an insolent disregard of their rights; but in such situations the masters of vessels, if it be necessary to avoid the 'risk of collision,' must yield even though it may seem to them timid or pusillanimous to do so."

A decree may be submitted in accordance with the foregoing.