250 F.2d 485
 TANK BARGE HYGRADE, Inc., Appellant,
v.
THE Tug GATCO NEW JERSEY.
GULF ATLANTIC TRANSPORTATION COMPANY
v.
THE Diesel Tanker F. L. HAYES.
Appeal of TANK BARGE HYGRADE, Inc., Claimant.
 No. 12176.
 No. 12177.
 United States Court of Appeals Third Circuit.
 Argued October 8, 1957.
 Decided December 2, 1957.
 Rehearing Denied January 16, 1958.
 
 John H. Hanrahan, New York City (Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., Foley & Martin, New York City, on the brief), for Tank Barge Hygrade, Inc.
 T. J. Mahoney, Jr., Philadelphia, Pa. (Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for appellee.
 Before BIGGS, Chief Judge, and MARIS and McLAUGHLIN, Circuit Judges.
 MARIS, Circuit Judge.
 
 
 1
 These two admiralty proceedings involve a collision which occurred at 11 o'clock P.M. on August 11, 1951 in the Delaware River between the diesel tanker F. L. Hayes and the barge Gatco 72 which was then being pushed by the tug Gatco New Jersey. The tanker was owned by Tank Barge Hygrade, Inc., and the barge and tug by Gulf Atlantic Transportation Company. Each corporation filed a libel against the vessel of the other and Tank Barge Hygrade, Inc. has appealed in each case from the interlocutory decree of the district court dividing the damages equally between the Gatco and the Hayes. The facts as found by the district court upon ample evidence were as follows:
 
 
 2
 The exact place of the collision is in dispute but all agree that it took place slightly to the east of the 800 foot wide channel and not far from the junction of Reedy Island and Baker Ranges. Reedy Island is the upper of the two ranges and it runs in a southeasterly direction, making an angle with Baker Range next below it which runs about due south and which is 1.65 miles long. There is plenty of water to the east of the channel on both ranges. There is a flashing buoy 2R at the east side of the channel in the angle between the ranges and another, 4B, on the east side of Baker Range possibly three-fourths of a mile further down.
 
 
 3
 Shortly before the collision, the tug Gatco New Jersey, with a barge made up ahead of it on a pushing gear, was descending Reedy Range at a speed of about 6 knots, and the Hayes, a 240 foot tanker, was entering the lower end of Baker Range, heading upstream and making 9 knots. These were the vessels involved in the collision. Coming up the river behind the Hayes was a larger and faster tanker, the Havmann, making 13 knots. At a point approximately opposite the 4B buoy, the Havmann passed the Hayes on the latter's port side. When the Hayes, following the Havmann, had just about passed the 4B buoy, the tug with its tow, which had been coming down the river outside and slightly to the east of the Reedy Island Range channel, turned into that channel, in order to have the 2R buoy on its port side when it rounded it, intending to go outside the channel on the east again in order to make a short cut to its destination. The Hayes was then close to the east side of the Baker Range channel and the Havmann well past the Hayes and about in midchannel.
 
 
 4
 Captain Gilliland of the tug testified that he rounded buoy 2R at a distance from it of 25 to 30 feet and immediately steered his vessel out of the channel and started down along its eastern side. Other evidence in the case, however, led the trial judge to the conclusion that the tug and barge as they passed the buoy were a good deal further out into the channel than Gilliland thought. Apart from what was observed by the witnesses on both the Hayes and the Havmann, the fact that Gilliland elected to turn back into the channel in order to pass the buoy on his port side because he was afraid that the tide would set him against the buoy, suggests that the tide was strong enough not to allow him to turn his rather unmaneuverable tow as sharply as he said or thought he did. The trial judge found, therefore, that, after it turned into Baker Range, the tug was well into the channel and that it continued in the channel, although constantly nearing its eastern side until the collision, which occurred just about on the east side of the channel.
 
 
 5
 Coming up Baker Range, Captain Welde of the Hayes saw the Gatco round the buoy — that is, he first saw her red side light which promptly turned to red and green, thus placing her dead ahead of him. He immediately blew a one-blast signal indicating that he intended to take or maintain a course to the Gatco's port. There was no reply from the Gatco, and the vessels continued to approach head and head. The Havmann, ahead of the Hayes, passed between the Hayes and the tug, the tug was momentarily out of Welde's sight and when she reappeared she was still heading straight for him, apparently having ignored his one-blast signal. Welde then blew another one-blast signal, at the same time putting his rudder hard right in order to avoid a head and head situation and at the same time carry out his announced intention of making a port to port passing. His signal was answered by two blasts from the Gatco and almost immediately the Gatco's red light disappeared, indicating that she was swinging to port directly across the course of the Hayes. Welde then gave three blasts, put his ship full astern and gave the alarm signal to his crew. At the same time, the Gatco blew the danger signal, but within a minute of this last exchange, the vessels collided, the bow of the Hayes, which was light loaded, running diagonally over the deck of the barge which was low in the water.
 
 
 6
 Upon the foregoing facts the district court concluded that the tug Gatco was guilty of gross, obvious, inexcusable fault. However, since the court could not say that the statutory fault of the Hayes in sounding a second one-blast passing signal instead of the danger signal prescribed by Article 18, Rule III, of the Inland Navigation Rules, 33 U.S. C.A. § 203, could not have contributed to the collision, it felt compelled, under the doctrine of The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, to direct the division of the damages equally between the two vessels. 144 F.Supp. 147.
 
 
 7
 The appellant strongly urges that in view of the gross nature of the fault of the Gatco and the minor and technical character of the fault of the Hayes the fault of the latter should have been glozed by the district court and the damages imposed wholly upon the Gatco. In support of this proposition the appellant cites City of New York v. American Export Lines, 2 Cir., 1942, 131 F.2d 902; Oriental Trading & Transport Co. v. Gulf Oil Corp., 2 Cir., 1949, 173 F.2d 108, certiorari denied 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1728; National Bulk Carriers v. United States, 2 Cir., 1950, 183 F.2d 405, certiorari denied 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631; and Compania de Maderas, etc. v. Queenston Heights, 5 Cir., 1955, 220 F.2d 120, certiorari denied 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736. It is true that these and other cases have stated that where one ship is gravely at fault the venial or merely technical fault of the other may be glozed and ignored. But those were cases in which the venial or technical fault did not contribute to the collision. Moreover, where a failure to follow a statutory requirement is alleged as a fault it may be questioned whether the rule of The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, would permit it thus to be ignored. But see Judge Woodbury's comment in Seaboard Tug & Barge v. Rederi Ab/Disa, 1 Cir., 1954, 213 F.2d 772, 775. However this may be, we agree with the district court that in the present case there is a reasonable probability that if the Hayes had blown the danger signal and immediately reversed her engines instead of blowing a second passing signal the captain of the Gatco might have desisted from his intended course and taken action which could have avoided the collision. The fault of the Hayes, although small in comparison with that of the Gatco, was therefore not merely venial or purely technical.
 
 
 8
 It remains true, however, that the fault of the Hayes was extremely minor in comparison to that of the Gatco. To require the equal division of the damages in such a case as this seems very unjust, particularly when we recall that in the case of personal injuries the maritime law has long imposed liability on a more equitable basis. The Explorer, C.C.La. 1884, 20 F. 135; The Wanderer, 20 F. 140; The Truro, D.C.E.D.N.Y.1887, 31 F. 158; Olson v. Flavel, D.C.Or.1888, 34 F. 477. But ever since 1854 when the Supreme Court in the case of Schooner Catharine v. Dickinson, 17 How. 170, 58 U.S. 170, 15 L.Ed. 233, adopted the doctrine of the English admiralty law that damage caused by collision shall be equally divided between the vessels at fault regardless of their degrees of responsibility that rule has been adhered to by the court in all maritime cases brought to recover for damage caused by collision to vessels, their cargoes and other property on board them. See the discussion of this matter and the cases cited in the opinion of this court on rehearing in The Margaret, 3 Cir., 1929, 30 F.2d 923, 928.
 
 
 9
 The rule of equal division of damages appears to have been founded upon the difficulty of determining, when both vessels were at fault, the degree of negligence in the one and the other. It was judicium rusticum, a sort of rough and ready rustic justice applied to the sea. The Max Morris, 1890, 137 U.S. 1, 12, 11 S.Ct. 29, 34 L.Ed. 586. When the faults are roughly equal the operation of the rule is just and satisfactory enough. Where, however, the fault of one vessel is palpably major and that of the other extremely minor the obvious injustice of the application of the rule of equal division of damages has led the courts to avoid it by glozing and ignoring the minor fault and imposing sole responsibility upon the vessel gravely at fault, as was done in some of the cases upon which the appellant here relies. But to ameliorate the unjust effect of one arbitrary rule by applying another which is equally arbitrary seems hardly the way to promote justice and reach an equitable result. How much better it would be to apply, in cases where it was feasible to do so, a rule of comparative fault analogous to that now applied in the admiralty in cases of personal injuries.
 
 
 10
 We need to recall in this connection that the United States today stands virtually alone among the great maritime nations in retaining this archaic rule in full vigor. Almost all the other maritime nations of the world have adhered to the Brussels Maritime Convention of 1910 which provides that damages caused by a collision either to the vessels concerned or to their cargoes or to the effects or other property of the crews, passengers or other persons on board shall be borne by the vessels in fault in proportion to the degree of the faults respectively committed, unless, having regard to the circumstances, it is not possible to establish the degree of the respective faults or it appears that the faults are equal, in which case the liability shall be apportioned equally. 6 Benedict on Admiralty, 6th ed., 1941, pp. 3 et seq. See Robinson on Admiralty, 1939, p. 854; Franck, A New Law for the Seas, 1926, 42 L.Q.Rev. 37, Huger, The Proportional Damage Rule in Collisions at Sea, 1928, 13 Corn.L.Q. 531; Mole and Wilson, A Study of Comparative Negligence, 1932, 17 Corn.L.Q. 333, 339; Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 1957, 45 Calif.L.Rev. 304.
 
 
 11
 Among the nations adhering to the Brussels Convention of 1910 are Great Britain, from which we obtained the equal division rule and which has thus now abandoned it, and our neighbors Canada and Mexico, as well as Argentina, Australia, Belgium, Brazil, Denmark, Egypt, France, Germany, Greece, India, Italy, Japan, The Netherlands, New Zealand, Norway, Poland, Portugal, Rumania, Spain, Sweden, the Union of Soviet Socialist Republics, Uruguay and Yugoslavia, among others. However, the abandonment of the archaic and frequently unjust rule of division of damages in favor of the rule thus now followed by the rest of the maritime world, is a matter not within the power of an "inferior" court to accomplish. As Chief Judge Learned Hand said in Oriental Trading & Transport Co. v. Gulf Oil Corp., supra, 173 F.2d at page 111, "we have no power to divest ourselves of this vestigial relic; we can only go so far as to close our eyes to doubtful delinquencies." But since in the case at bar the statutory fault of the Hayes in all reasonable probability may have contributed to the collision we cannot close our eyes to her fault, but must impose upon her half the damages resulting from the collision.
 
 
 12
 The interlocutory decrees of the district court entered January 21, 1957 will be affirmed.