**COMPANIA MARITIMA MADRILENA, S.A., Libelant,**

v.

**THE MS DAGAN, her engines, boilers, tackle, etc., and Zim Israel Navigation Company, Ltd., a corporation, Respondent and Cross Libelant.**

**NORTHERN ASSURANCE COMPANY, Libelant,**

v.

**THE S/S JARAMA and Compania Maritima Madrilena, S.A., Respondent.**

Nos. 413, 513.

United States District Court
S. D. Florida,
Tampa Division.

Dec. 23, 1959.

Fowler, White, Gillen, Humkey & Trenam, Tampa, Fla., for Compania Maritima Madrelena, S.A.

Allen, Dell, Frank & Trinkle, Tampa, Fla., for Zim Israel Navigation Company.

Shackleford, Farrior, Stallings, Glos & Evans, Tampa, Fla., for Northern Assur. Co.

WHITEHURST, Chief Judge.

These causes were brought in Admiralty. One was brought by Compania Maritima Madrilena, S. A., a Spanish corporation with office in Madrid, Spain, and at the time in question the owner of S/S Jarama, against the respondent The M/S Dagan and its owner, Zim Israel Navigation Company, Ltd. The respondent cross-libeled. The other cause was brought by Northern Assurance Company, insurer of the cargo of cement laden on board the M/S Dagan, against the S/S Jarama. Both actions having been combined for trial, and the Court having heard and considered proof offered by all parties, and argument of counsel, makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. The S/S Jarama is a steamship of Spanish registry and 4,937 gross tons, being approximately 413½ ft. in length and 52 ft. in width, with a home port of Cadiz, Spain. The Compania Maritima Madrilena, S. A. is a Spanish corporation with office in Madrid, Spain, and at the time in question was owner of the S/S Jarama.

2. The M/S Dagan is a single-screw, cargo vessel of 5,013 gross tons, 380 ft. in length, 58 ft. beam, and at the time involved in this action was owned and operated by Zim Israel Navigation Company, Ltd.

3. The Northern Assurance Company is a corporation and was the insurer of the cargo of cement laden on board the M/S Dagan at the time of the collision which is the subject of this action, which occurred on August 30, 1956, at 4:02 A.M.

4. On August 30, 1956, at approximately 2:00 o'clock A.M. the two named vessels were in pilotage anchorage off Egmont Key, Florida, and after taking aboard compulsory pilots the vessels proceeded inbound toward the channels of Tampa Bay; The S/S Jarama having departed shortly prior to the M/S Dagan; both vessels being fully loaded; The S/S Jarama drawing 24 ft. forward and 23 ft. 6 in. aft, and so being "down-by-the-head" was proceeding up Tampa Bay at a speed of approximately 8½ to 9 knots.

5. The M/S Dagan, drawing 24 ft. 8 in. forward and 25 ft. 7 in. aft, departed the pilot anchorage off Egmont Key shortly after the S/S Jarama, and was following the S/S Jarama as both proceeded up Tampa Bay, where later an accident occurred.

6. The night was clear; visibility was good; the wind was east/northeast with no more than Beaufort force of 2; and there was a flooding tide of about 1 knot. Both vessels were displaying regulation navigation lights.

7. As the vessels proceeded into a section of Tampa Bay Channel, designated as "B Cut", and when the M/S Dagan was in a position approximately one-half to three fourths of a mile astern of the S/S Jarama, she sounded a two-whistle signal requesting permission to pass to the port of the S/S Jarama. Whereupon, the S/S Jarama answered with a two-whistle signal indicating her agreement to the proposed passing.

8. At the location in B–Cut Channel selected for the passing, the channel was approximately 400 ft. in width; 34 ft. in depth; and the depth outside of the channel was approximately 23 ft. to 26 ft.; and the boundaries of the channel were marked by the usual navigational buoys.

9. Upon receiving from the S/S Jarama the assent to pass, the engines of the M/S Dagan were advanced from half-speed to full-speed-ahead, thus increasing her speed to approximately 12½ knots, and, at the same time, her course was altered 3° to the port or to the left of the center channel course to facilitate a safe passing. The S/S Jarama thereafter continued to maintain her speed, estimated at approximately 8½ to 9 knots.

10. The proposed passing proceeded without incident until the stem of the M/S Dagan arrived at a point approximately abreast of the stern of the S/S Jarama, or certainly not more than 50 ft. past, when suddenly the S/S Jarama sheered to her port and across the course of the M/S Dagan, and concurrently sounded a danger signal. The M/S Dagan immediately answered the danger signal and at the same time stopped her engines. Immediately prior to the S/S Jarama's sheer, the lateral distance between the bow or stem of the M/S Dagan and the stern of the S/S Jarama was from 50 ft. to 150 ft. The conflict in the proof as to this important distance is understandable because of the difficulty in estimating distance under the conditions present, it being in the nighttime. The S/S Jarama immediately before the sheer was on its right-hand side and near the center of the channel. In spite of the fact that both vessels, after the S/S Jarama sheered, maneuvered in an attempt to avoid collision, the port quarter of the S/S Jarama ultimately came in contact with the starboard side of the M/S Dagan at a point slightly aft of amidship. At this time, it was approximately 4:02 o'clock A.M. It was the sheer of the S/S Jarama across the course of the M/S Dagan which caused the collision.

11. The Court finds that the sheer of the S/S Jarama across the course of the M/S Dagan was not attributable to any fault or negligence on the part of the M/S Dagan or those in charge of her.

12. The S/S Jarama has failed to prove any excusable cause for her sudden sheer and her contention that the sheer was caused by a "bow pushing force" emanating from the bow of the M/S Dagan as it drew abreast of the stern of the S/S Jarama is not supported by credible proof.

The foregoing findings of fact are based upon consideration of the testimony of the following witnesses:

Pilot Ware of the S/S Jarama was of the opinion that "The displacement or bow wash or bow wave of the Dagan, approaching at a high rate of speed and close aboard, piled the water up under the port side of the stern of the Jarama listing it, and pushing it away, repelling it. As the stern was repelled, the only action the ship could take was to go across the bow of the Dagan".

On cross, the witness stated: "If you are asking me to prove by some well known physical law the effect of the bow wash or suction, I am wholly unprepared to do so. I am a ship handler and a pilot and not a physicist. I can only state from a practical point of view the effect of the turbulent commotion of bow wave, bow wash, or displacement of water created by the Dagan as she came up under the stern of the Jarama".

Captain Myers for the libelant, Compania Maritima Madrilena, S. A.—for 20

years a Master Mariner and at sea 29 years before retirement as a pilot in Tampa Bay, was of the opinion that: "One ship trying to pass another should make allowance for the displacement of the water or disturbance of the water caused by his bow, because the pressure and the suction, as we call it, also can affect the steering of either vessel if the speed is too great or they come too close together, and draft as well as speed could affect pressure or suction; although, speed affects displacement or suction". He was of opinion, however, that safe passing could be accomplished where the distance of 150 ft. between the ships was maintained. He further believed on hypothetical question that 75 ft. between the two ships would hardly be safe and that "* * * at 50 ft. or less you would get quite a bit of pressure".

Pilot Wilshire of the M/S Dagan observed the S/S Jarama's sheer and danger signal simultaneously, and at that time estimated the distance between the two as between 100 ft. to 125 ft. At that instant he ordered a stop on the Dagan. The witness had "no idea" what caused the Jarama to sheer.

Captain Posey, a retired Master Mariner, holding a license since 1919, with impressive experience, was given the hypothetical question reasonably grounded in the proof, as follows:

"Q. Take a single-screw vessel of the type and size of the Jarama, which is 413½ ft. in length, beam 52 ft. 2 in., and gross tonnage 4937, fully laden with 6700 tons of cargo, and drawing 24 ft. forward and 23½ ft. aft. Let us also take a single-screw cargo vessel of the type and size of the Dagan, with a length of 380 ft., beam of 58 ft., gross tonnage 5013, fully laden with cargo, drawing 24 ft. 2 in. forward and 25 ft. 7 in. aft. And suppose the Jarama to be proceeding inbound at a rate of speed anywhere from 8½ to 9 knots, and suppose the Dagan overtaking the Jarama on the latter's port side at a speed anywhere from 12½ to 13 knots; the overtaking occurring in Cut 'B' Channel in Tampa Bay, 400 ft. wide and 34 ft. deep, and the water on each side thereof is between 23 ft. and 26 ft. in depth; suppose the lateral distance between the two vessels to be anywhere between 50 ft. to 150 ft; and that the bow of the Dagan is anywhere from just abreast the stern of the Jarama to an overlap of 50 ft; the channel they are proceeding down is 38° true; the tide flooding; and the wind East/Northeast—under such conditions or any of them, would there be any suction exerted by the Dagan on the Jarama which would cause the Jarama to veer from her course across the course of the Dagan, or which would otherwise interfere with the Jarama's navigation? A. No, sir. I don't think so.

"Q. Have you ever heard of such a thing, under these circumstances, as displacement causing the overtaking vessel to sheer across the port? A. No.

"Q. Is there any force laterally to the bow of the ship? A. Not a whole lot. It may push a box out of the way, but not to bother the ship, particularly one drawing the draft of the one you spoke of. Something on the surface, such as a crate or something like that, might be washed away from the bow, but not a ship of the draft you spoke of."

The witness was of opinion that a ship "down-by-the-head" steers very poorly. If the helmsman "* * * is not very careful, he will hurt and aggravate it more by giving it more wheel than necessary."

He was of the further opinion that a flowing tide, a tide going with the ship, might have some effect in causing a sheer.

Captain Watkins, witness for the M/S Dagan, retired with a Master Mariner's license, and 51 years at sea—31 as Mas-

ter, and with impressive experience, given the same hypothetical question as that given to the witness Posey, answered:

"A. I don't see any way at all that it could interfere with the navigation, not at that point.

\* \* \* \* \*

"Q. Have you ever heard of a ship being what they call 'down-by-the-head'? A. Yes, sir \* \* \* she steers badly, to start with. As a matter of fact, I had an accident the same way."

On cross, the witness was of opinion that:

"\* \* \* it was careless steering that she took a sheer and the fact that she was by-the-head, he couldn't bring it back."

The witness further testified that there is not a heavy bow wave directly ahead of the ship. He never heard of a "heavy bow wave"—only "A slight wave \* \* \* not enough to affect anything." The witness was of opinion that suction from the Dagan would have no effect on the Jarama until they were abreast.

Witness Milton L. Jones, called by the M/S Dagan, is a marine surveyor to whom a Master Mariner's license was issued in 1932. He is a Lieutenant-Commander, United States Maritime Service Commission, and has had impressive experience, and has overtaken and passed vessels in narrow channels many times. His definition of suction is that it is "\* \* \* the action caused by the propeller as the vessel passed through the water and the water passes down along the side of the vessel \* \* \* it has the effect of drawing objects into the side of the vessel around amidship and further aft, and particularly around the propeller." Given the same hypothetical question as propounded to Captain Posey and Captain Watkins, Captain Jones thought there would be no force from the Dagan's bow upon the stern of the Jarama. He—"\* \* \* never heard of it". He was of the opinion that

a ship down-by-the-head becomes a cranky ship hard to steer; and sudden sheers may occur that are not given by the rudder action, nor by the propeller action. It is generally an involuntary action.

Captain Myers, the Jarama's witness, called in rebuttal added little to his testimony given in chief. Also called in rebuttal were Captain Stanton, a retired pilot, and Clifton Handy, a naval architect and marine engineer. In the opinion of the Court this latter testimony was of no consequence.

A theory similar to the one invoked by the S/S Jarama in this case was before the Court in The Princeton, 2 Cir., 209 F. 199, 200, where the able author commented as follows:

"The sole contention is that there is a pushing force exerted by the water displaced as a vessel's bow moves through it. The theory is that, since the displaced water must go somewhere, it must run off to port and starboard. There is no judicial acceptance of such theory, except, possibly the deliverance of a Canadian trial judge. Cadwell v. Ship Bielman, 10 Exchequer Rep. Canada, 155. It would seem that if such a phenomenon where known it would find place in standard books on navigation, and the able and experienced counsel who tried and argued the cause would have submitted excerpts therefrom for our consideration. Under these circumstances we cannot take judicial notice that there is such a force. No text-book tells of it; no such phenomenon has come within our individual observation; we do not know it to be 'a fact in nature.' The theory advanced that because water is displaced at the bow it will be pushed off either side, because there is nowhere else for it to go, we do not find persuasive. There is displacement only because the vessel moves forward; she moves forward only because the screw behind

her is pushing the water back; it seems to us more reasonable to suppose that the displaced particles of water take the shortest possible course, some along the sides of the ship, some along her bottom, to the place where room has been made for them by the movement of the screw and the consequent backward movement of the particles of water which the screw has kicked. Possibly this theory of what will happen may be incorrect; but certainly we cannot accept the theory advanced on the brief unless the weight of testimony supports it. But the weight of testimony is the other way  *  *  *."

13. The weight of the evidence in the case at bar is to the same effect, and contrary to the theory of the Jarama. It is, therefore, the Court's opinion that the Dagan was without fault and that the collision was the fault of the Jarama.

## Conclusions of Law

1. The S/S Jarama by reason of her sudden sheer across the course of the M/S Dagan is guilty of a statutory violation of Article 18, Rule VIII, (33 U.S. C.A. § 203) and Article 21 (33 U.S.C.A. § 206) of the U. S. Inland Rules.

2. The M/S Dagan as the overtaking vessel, whose duty is outlined in Article 24 (33 U.S.C.A. § 209) of U. S. Inland Rules, was not in any way at fault in the occurrence of the collision in question.

3. The S/S Jarama has failed to sustain by the requisite weight of evidence her burden of proof to establish that her statutory violation aforesaid not only did not but could not have contributed to the collision. See Griffin on Collisions, Sections 200, 201 and 258 and The Pennsylvania, 19 Wall 125, 136, 86 U.S. 125, 22 L.Ed. 148.

4. The S/S Jarama is solely at fault for the occurrence of the collision and all damages resulting therefrom and an appropriate decree so providing will be entered.