## THE CHARLEY A. REED.

## THE CITY OF TROY.

### (*District Court, S. D. New York.* January 4, 1884.)

COLLISION—ERIE CANAL—SUCTION—CANAL REGULATIONS.

Where the canal-boats D. C. S. and C. A. R. were approaching each other in opposite directions on the Erie canal, the former on the tow-path side and both towed by horses, and the steam canal-boat City of T. overtaking the C. A. R., attempted to pass her on the left, and as she did so, the effect of the steam-boat, by the swell from her bows and the suction from her propeller, was to render the C. A. R., for the time being, unmanageable by her helm, and sent her bows across to the other side of the canal, so that she struck and injured the D. C. S., *held*, that the steamer was in fault for attempting to pass the C. A. R. when the two were so near meeting, instead of waiting until they had passed each other, and that the C. A. R. was also in fault for not having stopped her team of horses when the City of T. had approached within 20 feet of her stern, as required by canal regulation No. 49; *held further*, that a vessel, which in her navigation violates any express regulation will be held chargeable with contributory negligence unless she shows clearly that such violation could not have contributed to the collision.

Actions for Collision.

*J. A. Hyland,* for libelant Peters.

*E. G. Davis,* for libelant Linihan and the Charley A. Reed.

*Beebe & Wilcox,* for the City of Troy.

BROWN, J. The above libels were filed to recover damages for injuries through a collision on the Erie canal, near Buffalo, east of Black Rock, at about noon of October 1, 1880, between the canal-boats D. C. Sutton and the Charley A. Reed, by which both were damaged. The D. C. Sutton had a full cargo, was towed by horse, and was go-

ing westward, and, according to custom, near the tow-path which was there on the south side of the canal. The Charley A. Reed was coming eastward, loaded, and towed by horse, and was about in the middle of the canal, which was there 85 feet wide. The steam canal-boat City of Troy was at the same time astern of the Charley A. Reed, and overtaking her from the westward, proceeded to pass her by going between her and the heel-path side of the canal. In doing so, as it is alleged by the libelants, she rendered the Charley A. Reed unmanageable, and threw her bows across the canal, so that the latter ran into the Sutton, the bluff of the starboard bow of each canal-boat striking the other and inflicting some damage on each. The owner of the Sutton libeled both the other vessels, alleging that both were in fault; and the owner of the Charley A. Reed has libeled the City of Troy, as the one solely in fault.

It is evident that the collision arose through the steamer's undertaking to pass the Reed when the Reed and Sutton were approaching each other from opposite directions. Whether the City of Troy was justified in this must depend partly upon the regulations and partly upon the distance the canal-boats were apart when she undertook to pass. The evidence shows clearly that a steamer in passing a canal-boat renders the latter for the time unmanageable by her tiller; the swell from the bows of the steamer first throwing the stern of the canal-boat away from the steamer, and afterwards, as the steamer approaches the bows of the canal-boat, having the same effect on her bows, while at the same time the strong suction from the propeller of the steamer, as it approaches and passes the stern of the canal-boat, draws the stern powerfully towards the steamer. The latter co-operating with the repelling effect of the swell on the bows of the canal-boat, is frequently sufficient to send the latter upon the opposite bank of the canal, from which the steamer often assists by a line in jerking her off. These ordinary effects of a steamer's passing a canal-boat in the canal were well known to all the parties to this controversy. It is clearly dangerous, therefore, for a steamer to attempt to pass a canal-boat when there is any other craft in the canal, which may be met, not merely before the steamer herself has passed, but before the canal-boat would have time to recover her proper position in the canal. Regulation No. 49 of the canal board (Manual of Canal Laws, 349) requires that a horse-boat, when approached within 50 feet by another horse-boat overtaking it, and proceeding in the same direction, shall turn from the tow-path, and give the rear boat every practical facility for passing, and stop whenever necessary, until the rear boat shall have passed. The same regulation requires a horse-boat, when approached within 20 feet by a steam-boat moving in the same direction, "to turn towards the tow-path, and cause their horse to cease towing until the steamer has passed five feet ahead" of it.

According to the steamer's witnesses she was going about two and one-half miles an hour, while the canal-boats were going from one and

one-half to two miles. They testify that when about a length and a half astern of the Reed, two steam-whistles were given as a signal to the Reed that the steamer would pass. These were not heard on the Reed, and the latter's witnesses testify that when she was about a length off they shouted to the City of Troy not to attempt to pass until they had got by the Sutton. These shouts were also unheard. The steamer proceeded to pass along the berme bank, there being sufficient room for her to do so without any change in the Reed's position. The City of Troy's witnesses say that when her signals were given the horses of the two teams were 200 feet apart, which would make the Sutton and the Reed at that time from 500 to 600 feet apart. But when the bows of the City of Troy began to lap the stern of the Reed, as all the other witnesses testify, the teams of the Reed and the Sutton had passed each other, and the two boats were not more than from 100 to 200 feet apart. The captain of the City of Troy testifies that he slowed down while passing the Reed, the object of which was to lessen the effect of the swell and the suction upon the Reed. When the Reed and the Sutton were about 200 feet apart the Sutton's team was stopped; the Reed's team was stopped when the City of Troy had lapped the stern of the Reed. The stopping of the teams, however, affected the progress of the canal-boats only measurably. The Sutton at the time of the collision was nearly stopped by land, as there was a considerable current in the canal against her; while the progress of the Reed, with the same current in her favor, could not have been much checked during the short time that elapsed between her team's stopping and the collision.

As the canal-boat was going only some two and one-half miles an hour, it was very plain that she could not possibly have passed the Reed before the Sutton was reached, even if at the time when her signals were given the distance between the Reed and Sutton was 600 feet, and the distance between the City of Troy and the Sutton 750 feet. The boats were all about 100 feet long, and at those rates of speed, respectively, the City of Troy would gain but two lengths while the Reed was going three. Even if the former had not slowed down while passing, she had three and one-half lengths to gain from the time when the signals were given before she would have cleared the Reed, and the latter would still have to recover her proper place in the canal in order to avoid running into the Sutton. And as the Sutton, moreover, was approaching the Reed at about the same rate, it is clear that at the time the City of Troy's whistles were given the Reed and the Sutton were not far enough apart to enable the City of Troy to pass the Reed before the Sutton would come abreast, unless she was going at a more rapid rate than her witnesses admit; and if she was, there was the greater danger through the greater disturbing effect upon the Reed while passing. On the evidence, therefore, I cannot entertain any doubt that the attempt to pass the Reed, with

its known hazards, was rash and foolhardy, and that the City of Troy must be held liable on the general ground of want of due care and regard for the safety of the other boats in the canal.

Regulation No. 50, although not in terms including this case, does, I think, by analogy, condemn, if it does not prohibit, a steamer's ever undertaking to pass another boat when a third would come abreast of them before they had sufficiently cleared. That regulation provides that, where two boats "coming in opposite directions, shall approach each other in the vicinity of a *raft*, so that if both should continue they would meet by the side of such raft, the boat going in the same direction as the raft shall stop until the other boat shall have passed the raft." The evident purpose is to prevent passing three abreast, with all the dangers incident to that situation. The Reed in this case was in a situation analogous to the raft referred to in this regulation. The steamer was going in the same direction, and by this regulation would be required to wait until the Sutton should have passed the Reed. There was nothing in this case to prevent the City of Troy from waiting until the Sutton and Reed had passed each other, which they would have done in less than two minutes after the City of Troy had reached the stern of the Reed. There is no obligation in the regulations, and none which reason can suggest, that the Sutton should have stopped rather than the City of Troy which could easily control her own motions; but manifestly the contrary. When the City of Troy was seen about to pass the Reed, the Sutton did stop and hugged the tow-path bank, and no fault is attributable to her.

With regard to the Charley A. Reed, I am obliged to find a violation of regulation 49 on her part, in not stopping when the steam-boat approached within 20 feet. Her helmsman first testified that his team did not stop until the City of Troy "was right broad-side of us." He afterwards said that when he first slowed up, the City of Troy had lapped about 10 feet. The regulation is explicit in such cases that the boat ahead shall cease towing when the steamer has approached "within 20 feet." Considering the precautions necessary for the safety of the boats, there was no reason why the Reed, even independent of this regulation, should not have stopped as soon as. the Sutton's team was stopped. No regulation required the Sutton to stop; her captain acted as a prudent person should act in view of probable danger. The Reed not only did not act with this care and prudence, though the danger was sooner visible to her, but she neglected the express requirement of the regulation as well. It is impossible to say that if she had slowed sooner this could have had no effect in avoiding the collision. The blow was a comparatively light one; she had a line thrown out to the City of Troy at the time for the purpose of keeping her off, and timely slowing by the Reed, as the regulation required, might possibly have been sufficient to avoid the collision altogether. The Reed must, therefore, be held liable for

contributory negligence in this respect.   *The Pennsylvania,* 19 Wall. 125.

It results from this that the owner of the Sutton is entitled to a decree against both the Reed and the City of Troy, and that the owner of the Charley A. Reed is entitled to a decree against the City of Troy for half his damages, with costs to the libelant in each case.