LEMMON, Judge.
This is an admiralty case brought in State Court pursuant to 28 U.S.C. § 1333, the Savings to Suitors Clause.
The Board of Commissioners of the Port of New Orleans (Dock Board) owned, operated and maintained the Gentilly (L & N Railroad Crossing) Bridge across the Inner Harbor Navigation Canal (Industrial Canal), which waterway was also owned, operated and ' maintained by the Board. On December 20, 1965, the M/V Gypsum Queen, owned by Gypsum Trans *387 portation Ltd., collided with the bridge and damaged the structure. The Dock Board filed suit to recover the cost of the dam-ges against Gypsum and Crescent Towing & Salvage Co., Inc., the owner and operator of two tugs which were assisting the Gypsum Queen at the time of the collision.
Gypsum filed a reconventional demand for damages to its vessel, contending that the bridge was improperly designed, constructed and maintained, and that the structure was a hazard and obstruction to navigation.
The Dock Board excepted to the recon-ventional demand, asserting that it was an agency of the State of Louisiana and immune from suit in tort. Gypsum then filed a peremptory exception to the original petition, alleging that the Dock Board was not authorized to sue and thus had no right of action.
Gypsum’s exception was overruled, but the Dock Board’s exception was maintained and the reconventional demand was dismissed. Gypsum appealed, and this court affirmed the dismissal. 209 So.2d 296 (La. App. 4 Cir. 1968). Applications for writs of certiorari were denied by the Supreme Court of Louisiana, 252 La. 260, 210 So. 2d 505 (1968) and by the Supreme Court of the United States, 393 U.S. 938, 89 S. Ct. 302, 21 L.Ed.2d 275 (1968).
After trial on the merits, judgment was rendered in favor of the Dock Board and against Gypsum in the amount of $30,134.-93, and Gypsum perfected this appeal. The trial court also rendered judgment dismissing the Dock Board’s demand against Crescent Towing, but no appeal was taken by the Board.
Because the doctrine of sovereign immunity was subsequently questioned in a concurring opinion in Board of Commissioners of Port of New Orleans v. Splendour Shipping & Enterprises Co., Inc., 255 So.2d 869 (La.App. 4 Cir. 1972), and the Supreme Court granted a writ of certiorari, 260 La. 1116, 258 So.2d 374 (1972), Gypsum now contends that the final decision in the Splendour case should control the dismissal of the reconventional demand in the present case. This contention is erroneous. The dismissal of the reconven-tional demand in the present case has long ago become final and cannot now be resurrected, regardless of the ultimate determination by the Supreme Court regarding sovereign immunity.
The Industrial Canal, constructed by the Dock Board in 1922 pursuant to legislative authority, connects the Mississippi River and Lake Pontchartrain. On the River side of the L & N Bridge, the Canal was approximately 400 feet in width from bank to bank, with a navigable channel about 200 feet wide and 37 to 38 feet deep. At the point of the bridge crossing, the Canal narrowed to approximately 240 feet in width from bank to bank. The canal here ran roughly north and south, and the bridge crossed from east to west.
The bridge was a single-leaf span of the Strauss bascule type, which opened vertically from east to west to an 83 degree angle. The channel opening within the span was bounded on either side by a wooden fender system, and the channel opening measured 92 feet from fender to fender. The bridge roadway was 65 feet wide, and the wooden fender system extended outward approximately 40 feet on either side of the bridge. A cluster of pilings was located at both entrances to the fender system, left and right. A diagram of the physical layout, introduced into evidence in the trial court and annotated with additional data by this court, is appended to this opinion.
The Gypsum Queen was a cargo vessel, 441 feet in length and 64 feet in beam, powered by steam turbine. On the day of the collision the vessel was carrying a full cargo and drawing over 24 feet of water. At about 2:00 P.M. the vessel entered the Industrial Canal from the Mississippi River-Gulf Outlet, having previously taken aboard a local licensed pilot as required *388 by law. Two tugs, one secured to the bow of the vessel with two hawsers about 70 feet long and the other similarly secured to the stern, assisted the Gypsum Queen in entering the Canal and then in navigating the channel in a northerly direction toward the Lake.
In the canal visibility was perfect, and there was a light wind out of the west-northwest. The captain determined from the bridge tender by radio that there was an estimated two-knot current at the bridge, running toward the River. When the Gypsum Queen sounded the three blast signal for permission to come through the bridge, the bridge tender promptly answered and opened the draw to its full elevation.
The vessel approached the bridge under her own power with engine orders varying from “dead slow” to “slow”. At this point the tugs were not being used for either pulling ahead or holding back astern. The vessel was “stemming the current”, and the captain endeavored to keep up just enough speed to maintain steerage.
On the bridge of the ship, located about 50 feet from the bow, were the captain, the pilot, the helmsman, who was steering the vessel, and the third officer, who telegraphed engine orders. The captain testified that they approached the bridge at dead center of the channel opening, but that as the bow reached a point about 15 feet into the fender system, the bow suddenly began to swing to port. In an attempt to obtain better steerage, the captain ordered the engines placed at “half ahead” and the rudder placed at “hard right”. When this maneuver failed to break the sheer, the captain ordered the engines put at “full astern” and dropped the starboard anchor. Additionally, the pilot ordered the forward tug to pull the bow to starboard and the stern tug to pull the stern to port.
The port side of the Gypsum Queen collided with the southwest fender system, resulting in damage to the vessel about 15 feet aft of the bow and in damage to the pilings and the fender system. The superstructure of the vessel also contacted the bridge span, causing further damage to both the ship and the bridge.
When the vessel stopped, the captain ordered the anchor raised and the engines placed at “emergency full ahead”. He testified that it then took 13 minutes for the vessel to clear the bridge opening. Later, it was determined that all engines, steering and navigational instruments were in proper working condition.
The master attributed the sheer to the current encountered when the vessel entered the bridge opening. When the engines were placed at “emergency full ahead”, he described the vessel as “barely moving” and “see-sawing back and forth” and the water on the sides of the ship as “rushing by at a tremendous rate of flow.”
On the other hand, the bridge tender employed by the Dock Board was in the control tower located on the southwest side of the bridge structure just behind the fender system and about 14 feet above the roadway. He testified that after he opened the draw for the Gypsum Queen, he observed through the tower window that the vessel was “hugging” the west side of the channel. When the bow was about one-ship length from the entrance to the fender system, he first became aware that there would be a collision and realized that the vessel was heading straight for the control tower. He warned an electrician working in the tower of the impending collision, and they abandoned the tower.
The bridge tender further testified that the ship dropped anchor about 200 feet 'off the southwest cluster of pilings, that the ship collided with this cluster at the entrance to the fender system, and that there was no sheer or sudden movement prior to the collision. He also observed that the Gypsum Queen entered the bridge opening slower than ships generally negotiate the passage.
The electrician estimated that the vessel was 400 to 500 feet from the southwest *389 cluster of pilings, headed directly for the control tower, when he first saw it upon being warned by the bridge tender. He left the tower, but heard the anchor drop before he heard the cracking of piles.
The trial judge accepted the factual version of the occurrence presented by the bridge tender and the electrician and rejected the conflicting testimony of the master and the pilot. On appellate review we find that there was sufficient eviden-tiary basis for the conclusions of the trial court in this respect.
Under the trial court’s findings of fact no sheer or sudden movement actually occurred, but the vessel simply failed to achieve a center channel approach and to maintain minimum steerage, which failure caused the subsequent collision. Furthermore, if there was in fact a sheer, we believe that the vessel is still liable for sheers caused by known and expected currents.
We now turn to a determination of the alleged negligence of the Dock Board. Gypsum contends that since the Dock Board never obtained a permit for the construction of the bridge, as required by 33 U.S.C. § 401 [1] the structure constituted an unlawful obstruction to navigation. Gypsum argues that when there is a violation of a statute intended to prevent collisions, a rebuttable presumption arises that the violation constitutes fault which was a contributing cause of the accident. Contending that the Board had failed to overcome the presumption by adequate proof, Gypsum requests that we apply the admiralty rule of divided fault.
Although it is admitted that no permit was obtained, a representative of the Corps of Engineers testified that no permit has ever been required for the building or maintenance of a bridge across the privately-owned Industrial Canal. However, even if we assume arguendo that a permit was nevertheless required under the statute, we believe that the imposition of statutory fault is not applicable in the present case for two reasons.
First, the basis of statutory fault which is urged in this case is the Pennsylvania Rule[2], which places upon the violator the burden of proving that his violation did not cause or contribute to the collision. However, this rule only applies where there is a violation of a statute which is designed to prevent collisions[3], such as the *390 statute in The Pennsylvania which required the use of a fog horn in dense fog.
 In our opinion 33 U.S.C. § 401 is not directly designed to prevent collisions, but rather to give the government power of approval and supervision of structures which could constitute a hazard to navigation if improperly constructed or maintained. Violation of this statute by failing to obtain a permit does not necessarily result in a hazard to navigation, as would violation of a statute by failing to sound a fog horn or failing to exhibit proper lights. Conversely, observance of the statute by obtaining a permit would not have prevented this collision, and we therefore believe that the non-observance is of no consequence in the determination of fault.
Second, statutory fault is imposed only when the structure is an obstruction in fact, causally related to the collision. Pacific Spruce Corp. v. City and County of San Francisco, 72 F.2d 712 (9th Cir. 1934).
Any bridge is an obstruction to the free navigation of a waterway, since it obviously restricts traffic in the waterway to the draw opening. This restriction is permitted because of the necessity of land transportation to commerce and convenience, but there must be a balance between the rights and the needs of land traffic and the paramount right to use of a waterway by water craft. This balance is achieved by prohibiting the unreasonable obstruction of navigation by a bridge. See 33 U.S.C. § 512.
There is no evidence in this case that this particular bridge unreasonably impeded navigation or rendered navigation of the canal unsafe. The record discloses that 98 ships made the passage through the bridge opening in a one year period shortly before the collision and that only two minor collisions occurred. Although it was shown that the current in the Canal increased in velocity through the partially constricted area and that this increase had been greater since the opening of the Mississippi River-Gulf Outlet, there was no testimony that passage could not be made in reasonable safety. Neither was there any evidence that the construction or operation of the bridge violated any safety standards, specifications, regulations or requirements for such structures. On the contrary, previous navigation records indicate that the bridge was not an unreasonable obstruction to vessels properly navigated.
We conclude that the collision would not have occurred if the Gypsum Queen had been properly navigated. We reject the application of statutory fault, and we are unable to find any evidence of actual fault on the part of the Dock Board which contributed to the cause of this collision.
Because of this conclusion, it is not necessary to pass upon Gypsum’s assignment of error that the trial judge refused to allow introduction of evidence of damages to the vessel, although the Supreme Court in denying certiorari on the exception reserved Gypsum’s rights “to have the allegations of the reconventional demand considered and applied as affirmative defenses.” We further need not consider how the sovereign immunity of one negligent party affects the calculation of divided damages.
The Dock Board by competent evidence proved damages in the amount of $30,134.-93. There was no countervailing evidence, and the amount of damages is not contested on appeal.
Accordingly, the judgment of the trial court is affirmed.
Affirmed.

*391

. 33 U.S.C. § 401 reads:
“It shall not be lawful to construct or commence the construction of any bridge, clam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: Provided, That such structures may be built under authority of the legislature of a State across rivers and other water-ways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: And provided further, That when plans for any - bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans lias previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army.”

. In The Pennsylvania, 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1873) the court held: “But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the' sole cause, was at least a contributory cause of the disaster.”
The presumption of fault arising from violation of a statute has come to be known as the Pennsylvania Rule.

. See also Griffin, The American Law of Collision, Ch. XV (1949).