**STATE SITE, INC., Plaintiff,**

v.

**K/S A/S HERAGAS, in personam, and M/V Heros, its engines, tackle, apparel, etc.; in rem Defendants.**

**No. B–84–1091–CA.**

United States District Court,
E.D. Texas,
Beaumont Division.

March 4, 1986.

Rex A. Frazar, Schechter, Eisenman, & Solar, Houston, Tex., for plaintiff.

Alan G. Sampson, Benckenstein, Oxford, Radford, & Johnson, Beaumont, Tex., for defendants.

## MEMORANDUM OPINION

HALL, District Judge.

The Court, after hearing the above-styled and numbered action, and considering the briefs and authorities presented by both parties, enters the following ORDER.

This Court has jurisdiction over the parties and this matter pursuant to its admiralty and maritime jurisdiction. 28 U.S.C. § 1333, 46 U.S.C. § 740, Rule 9(h) F.R.C.P.

This case arises out of an incident that occurred on July 3rd, 1983, between 11:00 a.m. and 11:30 a.m., at or about the right ascending bank of the Sabine-Neches Waterway, near the entrance to Lake Sabine along the Port Arthur Canal. (Defendants' Exhibit 5 and Plaintiff's Exhibit 23.) At the time and place in question, the Plaintiff was constructing a temporary ice plant for the manufacture and sale of ice, which would be sold to fishing vessels. In order to provide a means to transfer the ice to the waiting vessels, the Plaintiff had grounded a barge (M–637) in the waterway and, according to the testimony of Mr. Merrick, intended to construct a conveyor to haul the ice from the plant to the barge. For a representation of how the system was supposed to work and look, refer to the Defendants' Exhibits 16(a to i).

The Plaintiff's barge was partially filled with water to aid in weighing it down; the testimony varied as to the depth of the water in the barge from between three to six feet. The barge had a dry weight of 250 tons, however, with water added to it, the barge's total weight was between 700 and 800 tons. The barge was secured to the shore with four "deadman" moorings (see Plaintiff's Exhibit 21). According to the testimony of Steve Hale, a "marine surveyor", the breaking point of the ¾ inch stainless steel cable used to connect the barge to the "deadman" is 20–25 tons.

In addition to securing the barge via the "deadman" "arrangement", the Plaintiff also attached two cables from the barge to "eyes" located on cargo canisters or vaults on either side of the ice plant (see Plaintiff's Exhibits 18–2, 18–5 to 18–10, and 22). Mr. Merrick testified that this arrangement was to provide additional security. It was uncontroverted that the mooring arrangement for the barge did not include lateral lines of support, no bow and stern lines, and was not supported with "breasting camels", or other devices to restrain movement of the barge towards the shore. Also, the testimony reflected that the barge was resting on the bed of the waterway, which sloped downward towards the channel.

It was uncontroverted that the waterway was heavily traveled and subject to the effects of wake wash and suction. Mr. Merrick testified that the shoreline was losing at least a foot a year in erosion.

The storage canisters to which the additional cables were secured were not part of the ice plant and were not permanently attached to the ice plant. At the time of the incident, Mr. Merrick testified that the Plaintiff was in the process of constructing a "catwalk" which would link the canisters, stacked two high on each side of the plant, to the upper half of the ice plant. The canisters on both sides, and the ice plant, all rested on the same railroad ties atop a foundation of crushed rock (see Plaintiff's Exhibits 18–5 to 18–7). The canisters had a rated empty weight of 8,700 lbs., as shown in Defendants' Exhibit 2–M.

At approximately 11:20 a.m. the M/V HEROS passed the site of the Plaintiff's ice plant. Because of the dangerous nature of its cargo (Butadiene gas), the HEROS was given a traffic clearance by the U.S. Coast Guard, meaning that no other vessels were to be in the channel as the HEROS progressed upstream towards the Texaco Chemical Terminal in Port Arthur.

It was stipulated by the Defendant that it was the wake wash and suction from the M/V HEROS that caused the Plaintiff's barge to move. It was further agreed that it was the movement of the barge (the barge being secured to the canisters) which caused the bulk of the Plaintiff's damages.

This case turns on the proposition as to whether or not the Plaintiff had violated statutory provisions by failing to procure a U.S. Army Corps of Engineers permit to locate the barge in the Sabine-Neches waterway; and whether or not the Defendant was operating the HEROS in an imprudent manner (speeding) when the incident occurred.

The Plaintiff contends that the Defendant vessel, M/V HEROS, was speeding. To bolster that contention, the Plaintiff produced Robert Vasques, an employee of State Site at the time of the incident, who testified that he had "clocked" the HEROS at 22–25 mph immediately subsequent to the incident. Later, on cross-examination, Plaintiff's counsel had Wayne Parker, pilot of the HEROS on the date in question, perform a series of calculations which purported to show that the HEROS was traveling a speed of 15.81 kph at the time she would have passed Mesquite Point and the Plaintiff's construction.

Mr. Parker went on to say that the figures, compiled from the "log and bell" book of the HEROS (see Exhibit 1 of the deposition of Captain Snorre Smith-Olsen of the M/V HEROS) may have been inaccurate because the crew, unfamiliar with the locale, might have misplaced the ship when noting geographical references. The speed was determined by comparing the time indicated in the "log and bell" book with geographical reference as to where the ship was located at a given time and where the ship was located a number of minutes later. Mr. Parker also said that a speed in excess of 15 knots would have caused wide-spread damage along the waterway; and that the result of a speed of 22–25 miles per hour would have resulted in the devastation of the banks of the waterway, piers, docks and other boats in its path.

Captain Smith-Olsen testified by deposition that the HEROS never produced a wake swell of more than a foot or so high during the transit up the waterway (Page 32, Lines 2–7, Plaintiff's Exhibit 27). Mr. Vasquez, the Plaintiff's witness (on cross-examination) stated that he observed no damage to other piers, docks, and pleasure craft in the waterway to have been caused by the transit of the HEROS up the waterway. The Court also notes that the HEROS was not cited by the Coast Guard for "speeding" in relation to this incident and that the HEROS has a maximum rate of sea speed of 15 knots.

It is uncontroverted that the Plaintiff did not have a Corps of Engineers permit to locate the barge in the waterway. Mr. Merrick testified, however, that he had relied on the verbal representations of Lt. Tyrone Crear of the Corps of Engineers Pleasure Island office that no permit was

necessary. It was the position of the Plaintiff that they had substantially complied with the statutory requirements, or that their non-compliance should be excused because of their reliance on the representations of Lt. Crear. Incidentally, Lt. Crear was not called as a witness by Plaintiff and did not testify in the case.

The Court finds that the M/V HEROS was not operated in a negligent manner and at the time and place in question.

The Court further finds that the Plaintiff's non-compliance with 33 U.S.C. § 403, which makes it unlawful to construct any dock, pier, or other "obstruction" in or on the navigable waters of the United States without prior approval of the Corps of Engineers, cannot be excused. 33 CFR Part 320 et seq., requires that permission for construction within the navigable waterways be given in writing, on the basis of a written application (see 33 CFR Part 325 et seq.)

■ Unauthorized construction of a structure in the navigable waters is considered prima facie a nuisance. 33 U.S.C. § 403; *U.S. v. Norfolk-Berkley Bridge Corp.*, 29 F.2d 115, 125 (E.D.Va.1928); *William B. Patton Towing Co. v. Spiller*, 440 S.W.2d 869, 871–72 (Tex.Civ.App. Houston, 1969); *THE PENNSYLVANIA* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148. Under the "Pennsylvania Rule" a party breaching a statutory requirement has the burden of proving that not only was the breach *not* a contributing cause of the accident, but also, that the breach *could not have been* a contributing cause of the incident. *Dow Chemical Company v. Dixie Carriers*, 330 F.Supp. 1304, 1308 (S.D.Tex.1971); *THE PENNSYLVANIA*, supra. Here, the Plaintiff failed to meet that burden.

■ The law is plain that a written application must be made with the Corps of Engineers, and that the permission to commence construction must be in writing. Among the public policy rationale for this process is a chance to allow the Corps of Engineers to inspect the proposed construction (see 33 CFR Part 325.1(d)). While detailed engineering plans are not necessary, the regulations do require, *inter alia*, that sketches and plans be submitted to the Corps. Had that been done, the inherent weakness of the Plaintiff's mooring arrangement might have been brought to Mr. Merrick's attention.

The Court mentions this because even if the Plaintiff had obtained a valid permit, the result in this case would still be the same. While it is true that one takes a victim in tort as one finds them, it is also true that contributory negligence will diminish, and in some instances preclude, recovery by the victim.

In this action, the Court was persuaded by Mr. Hale's explanation as to why he found the Plaintiff's mooring arrangement to be faulty. Also, the Court notes that Lt. Michael Maes of the United States Coast Guard (in his deposition Page 7, Line 18 through Page 8, Line 5), who investigated this accident for the Coast Guard, stated that he believe the "mooring arrangement" utilized by the Plaintiff was "a contributing cause of the incident".

It was obvious to the Court that the "mooring arrangement" employed by the Plaintiff was deficient in every respect. It was a "make shift" arrangement that will not meet the test of how an ordinary prudent person would conduct his business affairs.

The value of this temporary ice plant which the Plaintiff testified was approximately $220,000.00 (in 1983) was in and of itself a reason to employ only the best methods to try and protect his investment. Tying the barge to insecure and unsecured objects was not the best or even a proper way to protect his investment. Ordinary prudence demanded more.

The Court can find no substantial evidence that the Defendant operated its ship in a manner that caused or contributed to the damage admittedly sustained by the Plaintiff.

Specifically, the Court finds that the mooring of the barge to the canisters was contributorily negligent, and that said con-

tributory negligence was a proximate cause of the damages in this incident. Indeed, Mr. Merrick testified on cross-examination that the bulk of the damages complained of would not have occurred *but for* his decision to tie the barge to the storage canisters.

It is, therefore, ORDERED, ADJUDGED and DECREED that the Plaintiff take nothing in this action; Judgment for the Defendant. Each side to bear its own costs.