In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 16-4264

LARRY ALEXANDER, *et al.*,

*Claimants-Appellants*,

*v.*

INGRAM BARGE COMPANY,

*Petitioner-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 13 C 3453 — **Amy J. St. Eve**, *Judge*.

_____

ARGUED SEPTEMBER 7, 2017 — DECIDED NOVEMBER 21, 2017

_____

Before WOOD, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. At 5:33 in the evening on April 18, 2013, a 14-barge tow pushed by the *M/V Dale A. Heller* was sucked into a powerful cross-current and broke up. Some of the barges crashed (or allided, as mariners would say) into the Marseilles Dam; some sank; some were saved. The accident happened during record-breaking rains and high water, and

a day later, the nearby town of Marseilles experienced significant flooding. This lawsuit, brought by a group who call themselves the Flood Claimants, represents an effort to fix blame for the allision and to recover for their flood damage. The Flood Claimants were stymied, however, when the district court ruled that the United States, which manages the Dam through its Army Corps of Engineers, was immune from suit for its role in the allision, and that the Corps was solely responsible for the accident. The Flood Claimants believe that Ingram Barge, the company that owns and operates the *Dale Heller*, shares some of the blame because of its failure to follow certain inland navigation rules and its more general negligence. We conclude, however, that the facts found by the district court were not clearly erroneous, and that those facts support the court's assignment of sole responsibility to the Corps.

**I**

We have no need or desire to replicate the district court's painstaking, minute-by-minute, account of the events leading up to the allision and its immediate aftermath. We commend that court's opinion to those who are interested in the details. See *In the Matter of the Complaint of Ingram Barge Co.*, 219 F. Supp. 3d 749 (N.D. Ill. 2016). We offer here only the highlights that pertain to the arguments on appeal.

Geographically, we are talking about a stretch of the Illinois River that runs from the upriver town of Channahon, Illinois, down to the Marseilles Lock and Dam, just downriver from the town of Marseilles. The Illinois River is a tributary of the Mississippi River, which it joins at Grafton, Illinois, a short distance northwest of St. Louis, Missouri.

Downriver from Channahon, which is about 50 miles southwest of Chicago, several points on the river play a part in this story. Dresden Island lies six miles downstream; another 26 miles down, at River Mile 248.0, is Ballards Island. Next one comes to Gum Creek, and finally, at River Mile 247.1, is the Dam. The Lock is another 2.5 miles downriver. Vessels heading downstream must use the Marseilles Canal, which is on the left descending side of the river below the Dam. The area between the Dam and Dresden Island is known as the Marseilles Pool. The Corps regulates its depth by opening and closing eight large gates, called tainter gates, at the Dam: higher openings correspond to a reduction in water level, and vice versa. The Dam's total opening is expressed in gate-feet, which is calculated by adding together the clearance between the bottom of each of the eight gates and the riverbed. The town of Marseilles is on the right descending bank of the river.

On April 16, 2013, in the evening, the *Dale Heller* began heading downriver from Channahon with a 14-barge tow. The weather forecast indicated that periods of heavy rainfall were expected in LaSalle County, where Marseilles is located. A hydrograph sent to Ingram's shoreside personnel, as well as to the Captain of the *Dale Heller*, Charles White, showed that the river was expected to rise on April 17 to a crest of 11.3 feet, well below flood level, and then recede. On the morning of April 17, Captain White had the *Dale Heller* hold up at Ballards Island, in the hope that conditions would improve before he had to navigate past the Dam.

At that point, another actor entered the picture: the *M/V Loyd Murphy*, under the command of Captain Anthony Ice. The *Loyd Murphy* had just traversed northbound through the

Marseilles Canal and was heading upriver. Because of the severe weather conditions, Captain Ice radioed Captain White and asked if he could tie up at Ballards Island alongside the *Dale Heller*. The two agreed that this made sense, and so the *Loyd Murphy* (with its tow of 15 barges) shoved in with the *Dale Heller*. The barges were lashed together with various head and stern lines. The resulting combination was huge: 29 barges, six across and five long, which measured 210 feet wide and 1,000 feet long.

Weather conditions, and thus river conditions, continued to deteriorate overnight. Around 10:00 p.m. the North Central River Forecast Center (a branch of the National Weather Service), which had been issuing increasingly gloomy forecasts, for the first time predicated that the river would reach flood stage at Marseilles. By the morning of April 18, Captains White and Ice were having trouble holding their position at Ballards Island, even though both towboats were using most of their power to stay in place. "Drift" (that is, floating debris of all sizes) was becoming a serious problem—one that potentially could take out a propeller, stop the engines of the towboat, and set the entire flotilla loose in the fast water. The forecast had worsened from moderate flooding to just below major flooding. The captains decided to try to reinforce their mooring by strengthening the ties linking the barges and by tying the combined tow to some trees on the island. Later that day, however, the strength of the current ripped the trees out of the ground and the tow slipped a short distance downriver. The captains also called for and received assistance from several other boats, including the *Nancy S.* and the *M/V City of Ottawa*.

With conditions so bad, the River Industry Action Committee and the Illinois River Carriers Association (IRCA) scheduled an emergency conference call to discuss the rapidly rising Illinois and Mississippi River levels and to come up with a plan for, among others, the *Dale Heller*. The call took place at 2:00 p.m. on April 18; representatives from Ingram, the Corps, and the Coast Guard, among others, participated. Given the problems that Captains White and Ice were having staying in place at Ballards Island, the group decided that the best option was for the Dam's lockmaster, Corpsman Larry Rodriguez, to lower the tainter gates so that each of the eight gates would leave a clearance of two feet between the river bottom and the bottom of the gate—in other words, 16 gate-feet—for a time just long enough to permit the *Dale Heller* safely to enter the Marseilles Canal. (There was some dispute in the district court over the question whether Rodriguez promised to lower the gates *by* 16 feet or *to* 16 feet, but the district court resolved this in favor of the latter, and the Flood Claimants do not contest that here.) Lowering the gates would have several effects: it would reduce the outdraft (that is, the cross-current pulling water toward the Dam) enough to permit safe passage; but at the same time, because the lower a setting is, the more water accumulates in the Marseilles Pool, the risk of flooding in the town would increase. At the time of the IRCA decision, the gate settings were quite high—70 feet—and so the Corps's commitment to lower them to 16 feet represented a significant undertaking.

Another aspect of the IRCA plan was that several vessels, including the *Loyd Murphy*, the *City of Ottawa*, and the *M/V Creve Coeur*, would help the *Dale Heller* flotilla hug the left descending bank of the river and guide it into the Marseilles Canal. Shortly after the IRCA call ended, the captains of

several of the affected vessels, including Captain White, met aboard the *City of Ottawa* to review their various roles in the maneuvers. By this time it was clear that they were facing record-breaking high waters. Captain White continued to believe, however, that if Lockmaster Rodriguez played his part and lowered the gates to 16 feet, he could get the tow into the canal.

At 5:02 p.m., Captain Ice relayed that the gates were "at 76 right now, … going down to 55." Captain White understood this to be an interim report; no one said that the plan had changed. He set out a minute later, moving slowly because that was the only way the group of 4 vessels and 14 barges could stay coordinated. At 5:15 p.m., Captain Ice radioed that it was still possible to abort the plan (or, as he later put it, they were at the "whoa or go spot"), but that he saw no reason to do so. Two minutes later, there was a garbled transmission from Captain Ice. He radioed that he was telling Rodriguez to "open up a little more" because some flooding in the town was starting to occur. Somehow the wrong words came out of his mouth. As he later explained, he inadvertently had repeated something that an observer from the Corps stationed on the *Loyd Murphy*, Jeff Griffin, had said. While Captain Ice did not actually make the call, Griffin *did* call Rodriguez to tell him to open the gates. After receiving Griffin's call, Rodriguez chucked the entire plan out the window: he stopped lowering the gates and instead *raised* them all the way up to 88 feet. This action intensified the cross-current elevenfold, causing the *Dale Heller*'s tow to break up, some barges to allide with the Dam, and some to sink. A picture of the resulting mess tells the story:



Kenneth R. Olson & Lois Wright Morton, *Runaway Barges Damage Marseilles Lock and Dam during 2013 Flood on the Illinois River*, 69 J. SOIL & WATER CONSERVATION 104A, 105A (2014). The *Dale Heller* itself briefly went out of control and spun around 360 degrees, nearly capsizing. Captain White managed to recover, however, and successfully brought to safety both the *Dale Heller* itself and, with the help of the other towboats, several of the barges in the flotilla. Some time later, the town of Marseilles experienced severe flooding. Over two

hundred residents sustained damage to their property, as did an elementary school.

## II

This suit began as a limitation action brought by Ingram under 46 U.S.C. §§ 30501, *et seq.*, but it became more complex over time. At one point, it involved claims, cross-claims, and counterclaims among the Flood Claimants, Ingram, the United States (on behalf of the Corps of Engineers), and Inland Marine Service (the owner of the *Loyd Murphy*). The United States and the Corps dropped out after the district court ruled that the United States was entitled to sovereign immunity under the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). See also 33 U.S.C. § 702c, ¶ 2. Other controversies were settled, leaving for trial only the Flood Claimants' claims against Ingram.

For purposes of case management, the district court divided the proceedings into three phases: (1) liability for the allision; (2) whether the allision caused the flooding in the town; and (3) damages. It held a ten-day bench trial on the first question—whether anything Ingram did or anything for which it was responsible caused the allision. In a 127-page opinion, it concluded that the answer was no, and that the *sole* proximate cause of the accident was the negligence of Lockmaster Rodriguez. It also held that Ingram was entitled to exoneration and limitation of liability under 46 U.S.C. § 30505. These findings rendered phases 2 and 3 unnecessary, and so the court entered final judgment in Ingram's favor.

On appeal, the Flood Claimants focus on Ingram's alleged violations of three Inland Navigation rules. If even one was violated, they argue, the district court should have applied

the *Pennsylvania* Rule (announced in *The Pennsylvania*, 86 U.S. 125 (1873)), which requires such a violator to show that its action *could not* have been a contributory cause of the accident. They also argue that Ingram knew enough about the allegedly negligent actions that it was not entitled to exoneration or limitation of liability. Although they say at the outset that they are largely satisfied with the district court's findings of fact, they argue that some are clearly erroneous, and that the court failed to apply the facts properly to the regulations.

## III

The Inland Navigation rules on which the Flood Claimants rely are issued by the Department of Homeland Security (where the Coast Guard is now lodged). See 33 U.S.C. § 2071. The Claimants single out three rules that they contend Ingram violated: Rule 2, the Responsibility rule, 33 C.F.R. § 83.02; Rule 5, the Lookout rule, 33 C.F.R. § 83.05; and Rule 7, the Risk of Collision rule, 33 C.F.R. § 83.07. The district court examined each rule against the backdrop of its findings of fact and found no violation. The Flood Claimants assert that the court committed legal error in some of its interpretations of the rules, and clear error in its application of the law to the facts in other instances.

Rule 2, the Responsibility rule, reads as follows:

> (a) Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

(b) In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

33 C.F.R. § 83.02. The Claimants assert that the planning behind the *Dale Heller*'s ill-fated effort to reach the Marseilles Canal was "disjointed, poorly communicated, and poorly conceived." Indeed, they accuse Ingram of behaving in a cavalier fashion about the whole situation. They find the IRCA call confused and unclear, the transit planning inadequate, and the arrangements to keep lines of communication open defective. And the Captains' meeting did nothing, in their view, to correct these deficiencies.

In addition to these problems, the Flood Claimants argue that there was no process to review or double-check the plan; that the pilot of the *Dale Heller*, Ron Shrader, objected to the plan; that the details of the plan were never committed to writing; and that no one ever nailed down the critical question of how long the gates were to remain at 16 feet. Taken together, they assert, these failings are so severe that the district court's conclusion that Rule 2 was not violated cannot stand.

As Ingram points out, however, Rule 2 calls for prudent action in the circumstances faced by the vessels. Those circumstances, as of the afternoon of April 18, were fraught with danger. The combined flotilla of the *Dale Heller* and the *Loyd Murphy* was slipping downriver despite the use of the full horsepower available to both vessels; the effort to secure the tows to Ballards Island had been thwarted when the force of

the current literally pulled the trees out of the ground; and none of the options was risk-free. The participants in the IRCA call considered the possibilities and opted for the best plan possible. If it was to work, every part of the plan had to be executed as well as possible.

The fact that the plan was not in writing meant nothing. As the district court found, "both maritime custom and private arrangement provided Ingram the right to rely on the lockmaster's representation that he would lower the gates to 16 feet to allow the *Dale Heller* safe harbor in the Marseilles Canal." Confirmation in writing made no sense in any event under the rapidly developing conditions the mariners faced. Nor was there time for a risk assessment any more formal than the one the IRCA group and then the captains undertook—the transit commenced only three hours after the IRCA call began. These were all experienced people, who were well aware of the risks from the outdraft, the lockmaster's ability to raise and lower the tainter gates, and his control over the entry to the Canal. These findings were all well supported in the record.

The court also found that the group made adequate arrangements for communications among the critical players—Captain White, the captains of the assist vessels, and the lockmaster. The Flood Claimants fault Captain White for not re-confirming the lowering of the gates with Lockmaster Rodriguez while the *Dale Heller* was proceeding toward the mouth of the Canal with its tow, but at the time he had no reason to think this was necessary. The burden was on Rodriguez to alert the others that he had decided to change the gate settings, and Captain White was entitled to rely on that understanding. Obviously, with 20-20 hindsight one can

say that additional checks might have helped. But Rule 2 does not punish failures to see into the future. And, depending on when they occurred, additional communications might not have helped. At some point—presumably the "whoa or go" moment Captain Ice mentioned—the *Dale Heller* and its tow of 14 barges would have been unable to do anything but continue downriver toward the Marseilles Canal.

We consider the question whether Inland Navigation Rule 2 was violated to be one of fact: were the measures Ingram's vessel took appropriate for purposes of this rule? The district court weighed the evidence and concluded that the Claimants failed to prove a violation of that rule. We see no clear error in that assessment.

Next we look at Rule 5, the Lookout rule, which reads as follows:

> Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 C.F.R. § 83.05. This appears to be the Flood Claimants' principal argument, at least if number of pages in the brief is any measure. They assert that the district court committed legal error by finding (as they characterize it) that Rodriguez's verbal commitment to lower the tainter gates to 16 gate-feet "eliminated Ingram's obligation to maintain a proper lookout." If that were what the district court had said, we would indeed be concerned. But the court held no such thing.

Rule 5 does not demand that a vessel have a separate person whose sole responsibility is to serve as a lookout. Instead, according to testimony at the trial, a vessel captain can serve as the required lookout if he has a 360-degree unobstructed view during transit. As the Flood Claimants admit, ample case law supports this proposition as well. See *Marport, Inc. v. Stabbert & Associates, Inc.*, 771 F.2d 1216, 1218 (9th Cir. 1985) (discussing the "well-settled" rule that the helmsman may "serve as lookout from the wheelhouse of a tug"). Captain White was aware of this rule and testified that he had the necessary unobstructed, 360-degree view from the bridge. If that were not enough, the court noted, Pilot Shrader was in a position to supplement Captain White's observations, as was Captain Ice in the *Loyd Murphy*, which was assisting in the transit operation.

The Flood Claimants respond that the record demonstrates that no one on the *Dale Heller*'s bridge had a truly unobstructed 360-degree view, because the barges it was pushing were covered, and so the water ahead of the tow (some 1,000 feet, it appears) was not visible. Only a person stationed at the front of the lead barge or on one of the assist boats could have alerted the captain to the moment when the tow hit the outdraft. Such a person, they argue, would also have seen how high the gates were after Rodriguez raised them to 88 feet; the Claimants assert that the gates were literally out of the water at that point and their height was unmistakable.

Once again, the Claimants' argument fails to take the entire record into account. Captain White, assisted by his pilot and the other vessels, was able to keep an adequate lookout. And he knew just where the greatest risk of outdraft was located—approximately 200 to 300 feet from the dam. Outdraft,

he explained, is ubiquitous on the Illinois River: it is present "[n]ot only just [at] this lock, but every lock." The critical fact had nothing to do with his lookout; it was instead that he was proceeding on the understanding that the outdraft would correspond to 16 gate-feet, whereas in reality he was moving into an outdraft at least 11 times stronger, associated with 88 gate-feet.

The district court rejected, as a matter of fact, the Claimants' hypothesis that a proper lookout would have seen that the gates were entirely out of the water. Testimony in the record indicated that upriver mariners cannot see the gate setting at the Marseilles Dam, at least with any precision. In broad terms, mariners can tell if the gates are wide open, or largely closed. Nevertheless, after reviewing the photographic evidence, the court concluded that the position of the gates was not plain. It also commented that

> [T]he visibility of an 88-foot gate setting by 5:27PM does not tell the Court that—with a proper lookout—a prudent mariner would have stopped the transit minutes before, having decided that the lockhouse could not get back to a 16-foot gate setting in time for the tow to avoid a powerful outdraft.

These findings are supported by the record and are not tainted by any legal error. We thus conclude that the district court's analysis of Inland Navigation Rule 5 was sound.

Finally, we consider Rule 7, the Risk of Collision rule, which in pertinent part says:

> (a) Every vessel shall use all available means appropriate to the prevailing circumstances and

conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

\* \* \*

(c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

33 C.F.R. § 83.07.

The Claimants' arguments with respect to Rule 7 largely repeat the points they make with respect to Rules 2 and 5. Once again, they contend that Captain White and Pilot Shrader violated the rule (this time Rule 7) by failing to speak up when they realized that the transit was not going as planned. The captain should have realized, they argue, that the plan to lower the gates to 16 feet had been scrapped or at least had run into trouble. They criticize Captain White for thinking, at 5:02 p.m., that Captain Ice's statement that the gates were "going down to 55" was a progress report, not a statement that 16 gate-feet was no longer the goal. Worse, at 5:16 p.m. when Captain Ice radioed that he was "telling [the lockmaster] to open up a little bit more gate because they're starting to flood up into them houses already," Captain White responded, "Okay." At that point, the Claimants insist, Captain White should have checked back with Lockmaster Rodriguez to find out what was happening. Rule 7 imposes a duty to take all steps to determine if a risk of collision exists. One easy such step, Claimants argue, would have been to check with the Lockmaster. Claimants conclude that his failure to do so was based on nothing more than an assumption, and such an action is forbidden by Rule 7.

The Claimants point to three transmissions in support of this argument: one at 4:23 p.m., one at 5:02 p.m., and one at 5:17 p.m. The first of these, from Captain Slack of the *City of Ottawa*, informed Captain White that "it takes them 4 minutes to shut the gates and 4 minutes to open them. So, they, they're going to shut four on the, the uh, left side and that's all." Pilot Shrader heard this and understood it to be a statement about the time it would take to move the tainter gates to 16 gate-feet. In fact, this was wrong: the gates move at the rate of one foot per minute, but there is no evidence that any of the river mariners knew this. Under the circumstances, the court found nothing unreasonable about the *Dale Heller*'s lack of a reaction to this transmission.

We already have discussed the 5:02 p.m. transmission, known to the parties here as the "76-to-55" message. Although a stranger to the situation might see this as ambiguous, Captain White had no reason to think that the IRCA plan, as confirmed at the captains' meeting, was not in place. A change from a 16-foot gate to a 55-foot gate would have been enormous, and he had no reason to think that such a significant change would be made without anyone's informing him. Tellingly, Captain White was uncomfortable with a gate setting of only 23 feet, which first prompted him to hold at Ballards Island on April 17. The court found his reliance on the earlier plan to be reasonable. That finding is not clearly erroneous.

Finally, while the 5:17 p.m. "open more gate" transmission from Captain Ice to Captain White is certainly troublesome, the court discussed it in detail earlier in its opinion. Captain Ice explained it this way:

> Prior to that transmission—that was actually a mix-up in my words—Captain Charlie [White] had said to me, I'm starting to get aground or I'm starting to suck down, as he's trying to come ahead on it. And I was getting ready to tell him, I'm going to pull your stern out, and just as I grabbed the radio, Jeff [Griffin] [a crane operator for the Corps who was working as an observer] said, hey, they're flooding the houses; I'm telling them to open up dam. And I just instantly repeated what he said rather than finishing my transmission.

The district court credited this explanation. Importantly, it also found that neither a towboat operator such as Captain Ice, nor a crane operator for the Corps, had the authority to instruct the Lockmaster to take *any* actions. The Lockmaster had the exclusive authority and duty to operate the gates and to manage all traffic through the canal. 33 C.F.R. § 207.300(a). Just as Rodriguez's regulatory authority supports the district court's conclusion that his actions were the sole proximate cause of the allusion, it suggests that Captain White did not violate Rule 7 by continuing after the "open more gate" transmission. He reasonably—although erroneously, as it turned out—relied on Rodriguez prudently to exercise his sole authority over the gates and passage through the canal. In addition, the court's review of other evidence, including photographs, convinced it that there was no flooding at that point to be observed.

Taking all the facts into account, the district court concluded that the Claimants also failed to establish a violation

of Inland Navigation Rule 7. We find no clear error in the factual finding that Ingram, and its vessel the *Dale Heller*, were not at fault for failing to question, mid-transit, whether everyone was still following the IRCA plan.

The Flood Claimants' failure to demonstrate a violation of any Rule of Inland Navigation means that the *Pennsylvania* rule does not come into play. That rule, which the Claimants raised for the first time in their post-argument briefing at the district court, addresses the finding of fault when a regulatory violation has been shown:

> But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*The Pennsylvania*, 86 U.S. at 136 (1873). This shifts the burden of proof from the claimant to the shipowner, and it requires the shipowner to rule out all possibility that the regulatory violation contributed to the accident. But that onerous burden does not arise unless the predicate violations are proven, and they were not in this case. The *Pennsylvania* rule is thus of no help to the Flood Claimants.

Our conclusions with respect to the Inland Navigation Rules make it unnecessary for us to address Ingram's entitlement to exoneration and limitation of liability under

the Limitation Act, 46 U.S.C. § 30501, *et seq*. We thus have no comment on this part of the district court's opinion.

**IV**

The flooding that struck Marseilles in April 2013 was terrible. It caused millions of dollars of damage to individual property owners, the City itself, and an elementary school. Whether the barge accident we have been discussing caused some or all of that flooding is an issue the district court did not reach, because it found that the accident itself was solely caused by the Army Corps of Engineers' Lockmaster Rodriguez. Because of the discretionary function exception to the Federal Tort Claims Act, the Corps cannot be sued for Rodriguez's actions, however negligent or inexplicable they may have been. The court's finding that Rodriguez was solely responsible is, like its other findings of fact in this case, supported by the record and not clearly erroneous. We thus AFFIRM the judgment of the district court.